In re G. Ware TRAVELSTEAD, Debtor.

Karen L. HOBSON, Appellant,

v.

G. Ware TRAVELSTEAD, Debtor,

and

Joel I. Sher, Liquidating
Agent, Appellees.

No. Civ.A. CCB–98–463.

United States District Court,
D. Maryland.

Aug. 21, 1998.

Lewis S. Goodman, Jamie Eisenberg, Rifkin, Livingston, Levitan and Silver, Baltimore, MD and John Leidig, Baltimore, MD, for plaintiff.

Paul M. Nussbaum, Kenneth Oestreicher, John F. Carlton, Whiteford, Taylor and Preston, Baltimore, MD and Joel I. Sher, Kimberly A. Manchester, Shapiro and Olander, Baltimore, MD, for defendants.

### *MEMORANDUM*

BLAKE, District Judge.

This is an appeal from the bankruptcy court's confirmation of a plan of reorganization filed under Chapter 11 of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, codified as amended at 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code" or "Code"). Party-in-interest and creditor Karen L. Hobson appeals from the bankruptcy court's December 31, 1997 Order Approving Debtor's Modified Fifth Amended Disclosure Statement and Confirming Debtor's Third Modified Fourth Amended Plan of Reorganization ("Plan"). She argues that the Plan was not confirmable because her due process rights under 11 U.S.C. § 1109 and Fed.R.Bankr.P.2002(b) were violated; because the prerequisites to confirmation in 11 U.S.C. § 1129 and related sections were not satisfied; and because the bankruptcy court in confirming the Plan violated principles of international comity in regard to certain Dutch court judgments obtained by Ms. Hobson. Both G. Ware Travelstead ("Debtor" or "Mr. Travelstead") and Joel I. Sher ("Liqui-

dating Agent") oppose Ms. Hobson's appeal. Jurisdiction is proper under 28 U.S.C. § 158(a); *see also* Fed.R.Bankr.P. 8001, 8002; Local Rule 403. No hearing is deemed necessary. *See* Local Rule 105.6. For the reasons that follow, the bankruptcy court's order confirming the Plan and Disclosure Statement will be affirmed.

### I. *BACKGROUND*

#### A. *Statutory Background*

In a case commenced under Chapter 11 the debtor may file a plan of reorganization[1] with the bankruptcy court. 11 U.S.C. § 1121(a). Section 1123 governs the terms of such a plan and contemplates that creditors' claims will be divided into classes and that each claim in a particular class will be treated the same. 11 U.S.C. § 1123. A plan may alter the rights of creditors and/or shareholders, a concept called "impairment" under the Code. 11 U.S.C. § 1124. The debtor must provide creditors (and shareholders if they exist) with an adequate disclosure statement detailing the debtor's financial predicament, 11 U.S.C. § 1125, along with an opportunity to vote on the plan, 11 U.S.C. § 1126. Congress has explained this statutory framework as follows:

> The premise underlying ... chapter 11 ... is the same as the premise of the securities law. If adequate disclosure is provided to all creditors and stockholders whose rights are to be affected, then they should be able to make an informed judgment of their own, rather than having the court or the Securities and Exchange Commission inform them in advance whether the proposed plan is a good plan.

H.R.Rep. No. 95–595 at 226 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6185. Accordingly, the bankruptcy court does not review a Chapter 11 plan before it is submitted to creditors and shareholders for vote, but instead reviews the information provided to creditors and shareholders in the disclosure statement to ensure that their judgment is an informed judgment. 11 U.S.C. § 1125(b–

---

1. As discussed later in this opinion, a plan may provide for the liquidation of all the debtor's assets.

c). After the votes are in, the bankruptcy court is then required to hold a hearing on confirmation of the plan. 11 U.S.C. § 1128. The bankruptcy court has the power in certain circumstances to confirm a plan that has not received the needed votes over a dissenter's objection. 11 U.S.C. § 1129. Confirmation of a plan by the court operates (with limited exceptions) as a discharge of any pre-confirmation debt, regardless of whether the plan listed the debt, the creditor or shareholder accepted the plan, or the creditor or shareholder filed a proof of claim under 11 U.S.C. § 501; and the debtor's performance obligations are thereafter governed by the confirmed plan. 11 U.S.C. § 1141(d).

### B. *Factual Background*

Before this bankruptcy proceeding was initiated by Mr. Travelstead's filing of a voluntary Chapter 11 petition, he and Ms. Hobson had acquired a Dutch corporation, Blockless, B.V. ("Blockless"), for the purpose of investing in Australian real property. Mees Pierson Trust, B.V. ("Mees Pierson"), a Dutch trust company, was appointed managing director of Blockless. The Debtor is the majority shareholder with an 80% interest,[2] and Ms. Hobson holds the remaining 20%. Ms. Hobson's interest in this case arises, broadly stated, from her position as an allegedly aggrieved minority shareholder in Blockless.

On December 4, 1995, the Debtor in several transactions borrowed a total of approximately AUS$4,900,000 from Blockless pursuant to a Loan Agreement containing a Dutch choice-of-law clause ("Loans"). The Loans were granted with the consent of Ms. Hobson and were secured by the Debtor's stock in Blockless ("Deed of Pledge"). The Debtor failed to pay the Loans when due, and on February 14, 1996 used his majority vote in Blockless to pass a corporate resolution extending the Loans' maturity date, with Mees Pierson's cooperation and over Ms. Hobson's objection. Ms. Hobson then instituted legal proceedings against Blockless and Mees Pierson in the Netherlands, and on May 9, 1996 obtained a Judgment Order from the President of the District Court of Rotterdam requiring Blockless immediately to collect the Loans from the Debtor and if necessary execute upon the Deed of Pledge.[3] On May 29, 1996 Blockless sent a demand for immediate repayment of the Loans to the Debtor.

On May 31, 1996 the Debtor filed for Chapter 11 bankruptcy in the District of Maryland.

On June 19, 1996 Ms. Hobson petitioned the Dutch court to prevent Blockless from making any further payments (such as loans or distributions of corporate profits) to the Debtor or entities related to him before the Loans had been repaid.[4] On July 16, 1996 the Dutch court granted her petition, ordering Blockless to refrain from granting loans or making other payments to the Debtor (or entities related to him) without prior approval of all shareholders, i.e. without Ms. Hobson's consent. The court conditioned its relief on Ms. Hobson's filing of a buyout proceeding against the Debtor under Article 2:343 of the Dutch Civil Code. This Dutch statute allows an aggrieved minority shareholder to compel a majority shareholder to purchase her shares at a value to be determined by a Dutch court ("buyout proceeding"). On August 5, 1996 Ms. Hobson instituted such a buyout proceeding, alleging that the Debtor's conduct on February 14, 1996 causing Blockless to pass the resolution extending the maturity date of the Loans was prejudicial to her interest as a minority

2. The Debtor's Plan lists the Debtor as a 53.75% owner of the stock interest, a 45% owner of the gross distribution rights, and 80% owner of the voting rights. (Plan, ¶ 1.9 at 3, ¶ 5.5.a at 18, Bankr.Dkt. No. 605 (hereinafter cited simply as the "Plan")). Apparently the Debtor had at some point conveyed part of his interest in Blockless to other parties. This detail is not relevant to the issues to be decided on this appeal, however, and will not be discussed further.

3. The Dutch court held that "where Travelstead obviously requires Hobson's consent to contract loans from Blockless, he would also require such consent if he chose to extend any loan agreement, unless such extension were provided for by the Loan Agreement itself." (May 9, 1996 Dutch Judgment, ¶ 4.4.) The Dutch judgments were translated into English, and submitted into evidence by Ms. Hobson at the confirmation hearing.

4. Blockless on May 9, 1996 had disbursed AUS$225,000 to the Debtor for "profit share distribution." (July 16, 1996 Dutch Judgment, ¶ 4.4.)

shareholder in Blockless. On November 27, 1997 the District Court of Rotterdam issued a judgment ordering the Debtor to purchase all of Ms. Hobson's shares in Blockless ("buyout claim").

Thus, as a result of Ms. Hobson's efforts, two judgments from the Dutch court now exist: one ordering Blockless immediately to collect the Loans from the Debtor, and the other ordering the Debtor to buy out Ms. Hobson's minority shareholder interest in Blockless.

On October 21, 1997 Blockless at Ms. Hobson's urging demanded that the Debtor repay the Loans within thirty days, and stated that if he failed to do so Blockless would execute upon the Deed of Pledge. On November 12, 1997, the Debtor instituted a separate adversary proceeding against Ms. Hobson (and others, including Blockless), alleging that her post petition attempts to cause Blockless to comply with the (prepetition) May 9, 1996 Dutch court order to Blockless to collect on the Loans violated the automatic stay provision of the United States Bankruptcy Code, 11 U.S.C. § 362(a). The bankruptcy court granted a preliminary injunction on November 26, 1997, and scheduled a final hearing on that injunction for December 18, 1997. Blockless appeared specially to argue that the bankruptcy court could not constitutionally assert personal jurisdiction over Blockless. After some discussion, the Debtor voluntarily and without prejudice dismissed Blockless as a defendant in the adversary proceeding.[5] (Tr. Dec. 18, 1997 at 19.) After opening statements by Ms. Hobson's and the Debtor's respective counsel concerning essentially the same issues of international law presented for decision in this appeal, which the bankruptcy court rejected for purposes of the preliminary injunction, (*see* Tr. Dec. 18, 1997 at 19–41) the parties reached an agreement whereby Ms. Hobson agreed to an injunction prohibiting her from taking further action seeking to cause Blockless to collect the Loans or to enforce the Deed of Pledge securing them, subject to further order of the bankruptcy court granting her relief to do so.

Immediately after the parties agreed to the preliminary injunction in the separate adversary proceeding, the bankruptcy court commenced the confirmation hearing on the Debtor's Chapter 11 Plan. Ms. Hobson opposed confirmation. The hearing lasted for the remainder of December 18, and was continued on December 22 and December 29, 1997. The Debtor's Plan consisted of six classes of creditors. The first five classes each contained the secured claim of a single creditor, and the sixth grouped together all unsecured claims and creditors. All classes were deemed "impaired" under 11 U.S.C. § 1124, which means (with limited exceptions) that the legal, equitable or contractual rights of the claimholders would be altered by confirmation of the Plan. Blockless was the sole Class 2 creditor by virtue of its claim for the unpaid Loans, which were secured under the Deed of Pledge by the Debtor's shares in Blockless. The Debtor had taken the position that Ms. Hobson was not a creditor, and accordingly did not list her in the Plan as a creditor. Ms. Hobson agreed until near the end of the confirmation hearing that she was not a creditor. (As will be discussed in section II.A.1 of this opinion, the Debtor now concedes that Ms. Hobson is a creditor with respect to her buyout claim, and Ms. Hobson now claims that she was denied rights due her as a creditor).

On December 29, 1997, at the end of the three-day confirmation hearing Judge E. Stephen Derby announced that he would confirm the Plan over Ms. Hobson's objections, provided that the Debtor add her buyout claim to the Plan, stating his reasons for doing so from the bench in an oral opinion. (Tr. Dec. 29, 1997 at 132–37.) Accordingly, the Debtor added paragraph 13.6 to the Plan:

> 13.6 In the event that (I) Karen L. Hobson ("Hobson") obtains a final non-

---

**5.** The main basis for the Debtor's voluntary dismissal of Blockless was the representation by counsel for adversary proceeding defendant Patrick J.B. Donnelly, a co-managing director of Blockless, "that Mr. Donnelly is subject to the jurisdiction of the Court and will abide by any order." (Tr. Dec. 18, 1997 at 17.) According to the Debtor's counsel, Blockless could not under relevant Dutch corporate law take the contested actions without Mr. Donnelly's approval. (*Id.* at 14.)

appealable order or judgment by a court of competent jurisdiction directing that the Debtor purchase her shares of stock in Blockless or obtains a final non-appealable judgment against the Debtor as a result of her efforts to compel the Debtor to purchase her shares of stock in Blockless, and (ii) the Debtor and/or Liquidating Agent fail to make, or cause to be made, the payment to Hobson as required under such order or judgment: Hobson shall have a claim for the unpaid portion of said required payments (the "Buyout Claim") and the Buyout Claim shall be afforded treatment identical to that for holders of Class 6 Claims under the Plan. Upon payment to Hobson on account of her Buyout Claim, in the manner accorded to Class 6 Claimholders, she shall deliver to the Liquidating Agent her shares of stock in Blockless.

On December 31, 1997 the bankruptcy court entered its order confirming the Plan and issued a brief memorandum opinion supplementing the reasons given at the conclusion of the hearing. In that opinion the court held with regard to the Dutch buyout judgment that

"Ms. Hobson holds a debt from Mr. Travelstead that will be discharged by confirmation because she holds a contingent and unliquidated right to payment that arose before confirmation by virtue of the buyout proceedings she has instituted in the Netherlands. 11 U.S.C. §§ 1141(d)(1)(A), 101(12), 101(5). Therefore, Ms. Hobson's debt may be, and should be, treated under Debtor's Plan of reorganization."

(Mem. Suppl'g Reasons Given During Conf. Hr'g, at 1, entered December 31, 1997.) The bankruptcy court refused, however, to accept the Debtor's proposed paragraph 13.6.1, which provided, similar to paragraph 13.6's treatment of Ms. Hobson's contingent and unliquidated buyout claim, that:

6. She also moved for a stay or partial stay of implementation of the Plan pending appeal. The bankruptcy court denied this request on January 8, 1998, and this court affirmed the bankruptcy court's denial of the stay on February 19, 1998.

7. The Rule provides, in relevant part:

13.6.1. In the event that Blockless obtains a final non-appealable judgment from a court of competent jurisdiction against the Debtor as a result of Hobson's efforts to compel the Debtor to purchase her shares of stock in Blockless, Blockless shall have a claim against the Debtor, which claim shall receive treatment identical to that provided for the Buyout Claim in § 13.6.

The bankruptcy court explained in its supplemental memo that "[t]his court is not exercising jurisdiction over the corporate governance of Blockless Investments B.V." (*Id.*)

On January 5, 1998 Ms. Hobson filed this appeal which is now fully briefed and ready for decision.[6]

## II. *ANALYSIS*

■ A bankruptcy court's findings of fact are reviewed under the clearly erroneous standard, and its conclusions of law are reviewed de novo. *See* Fed.R.Bankr.P. 8013[7]; *In re Bryson Properties, XVIII,* 961 F.2d 496, 499 (4th Cir.1992). Additionally, the Bankruptcy Rules incorporate the harmless error standard found in Fed.R.Civ.P. 61. *See* Fed.Bankr.R.P. 9005. Fed.R.Civ.P. 61 provides that "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

### A. *Due Process*

Ms. Hobson asserts three related arguments pertaining to her right to notice and an opportunity to be heard in the confirmation hearing. First, she claims that because the Debtor failed to classify her properly as a creditor with regard to her buyout claim, she did not receive the formal notice of the confirmation hearing as required by Fed.R.Bankr.P.2002(b). Second, she asserts that the bankruptcy court at the confirmation hearing improperly limited the scope of her

Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Fed.R.Bankr.P. 8013. *Cf.* Fed.R.Civ.P. 52(a) (employing identical language but substituting "trial court" for "bankruptcy court").

evidentiary presentation solely to issues involving Blockless and the Blockless stock, in violation of her right under 11 U.S.C. § 1109 to "appear and be heard on any issue." And third, as a result of the Debtor's failure to classify her as a creditor in his Plan, she claims she was denied her right to vote on the Plan as provided in 11 U.S.C. § 1126(a) ("The holder of a claim or interest ... may accept or reject a plan."). Addressing these issues in turn, I first determine that Ms. Hobson was a pre-petition creditor by virtue of her buyout claim, and then reject her due process and denial of voting rights claims.

### 1. *Creditor*

■ Ms. Hobson has two separate interests in the Debtor's bankruptcy estate. These interests have not been treated by the parties with consistent analytical clarity, as they must be to disentangle the issues presented for decision on this appeal. Ms. Hobson's first interest is through her 20% minority shareholder position in Blockless. Blockless, as the sole Class 2 claimholder under the Plan, is indisputedly a creditor of the Debtor. Any effect that the Plan has on Blockless is likely to affect the value of Ms. Hobson's shares, but she does not, merely by virtue of her interest in a corporation which is a creditor of the Debtor, also become a creditor. This point is not controversial, and all parties have agreed that she is not a creditor of the Debtor with regard to this interest.

■ But Ms. Hobson's second interest, her buyout claim against the Debtor, has engendered some confusion over how it should be treated (apparently because of the international law issues bound up with that claim and discussed later in this opinion, or simply because of litigation strategy), and forms the basis for the three due process violations she now asserts. Ms. Hobson denied that she was a creditor of the Debtor at the preliminary injunction phase of the con-

firmation hearing, (Tr. Dec. 18, 1997 at 36), and never argued that she was a creditor during the evidentiary phase of the confirmation hearing. (*See, e.g.,* Tr. Dec. 18, 1997 at 62, 70–71, and Dec. 29, 1997 at 14, where counsel for Ms. Hobson failed to contest counsel for the Debtor's assertions that Ms. Hobson was not a creditor.) The bankruptcy court at the beginning of the confirmation hearing ruled that she was a party in interest entitled to be heard under 11 U.S.C. § 1109(b), but, apparently based on Ms. Hobson's counsel's own statement of her reasons for appearing to oppose confirmation of the Plan, quite logically limited her evidentiary showing, on grounds of relevance, to issues regarding Blockless—the entity through which she claimed her interest in the case. (*See* Tr. Dec. 18, 1997 at 36, argument of Ms. Hobson's counsel ("Ms. Hobson does not have any direct rights against Mr. Travelstead. Ms. Hobson is not a direct creditor of Mr. Travelstead. She never loaned Mr. Travelstead any money, Blockless loaned the money. Ms. Hobson is a minority shareholder in Blockless."); *id.* at 71 ("[S]ince Ms. Hobson is a creditor of Blockless, or a shareholder of Blockless, Your Honor, and also a creditor of Blockless, the result of the Plan, if the nature of Mr. Travelstead's obligation to Blockless is changed, that [sic] directly affects Ms. Hobson's rights."))

Although Ms. Hobson did not assert creditor status as to her buyout claim (her arguments went generally to the effects of the Plan on her minority shareholder status in Blockless), the bankruptcy court nevertheless heard evidence on that claim, overruling the Debtor's objection in the process (*e.g.,* Tr. Dec. 22, 1997 at 178–79, where Ms. Hobson testified as to her understanding of Dutch law regarding her buyout claim), and was scrupulously careful to look out for her interest in that claim over both the failure and reluctance of the Debtor to provide for it in the Plan. (*See, e.g.,* Tr. Dec. 29, 1997 at 26–38.[8]) The court, at least initially, considered

---

8. Addressing the Debtor's counsel during closing argument, the court explained:

My concern is that we are not taking away the third party's rights in this situation. I mean, that is the question that I have, that I have been asking about, that I don't see represented

here. That is why I have allowed [Ms. Hobson's counsel] to go forward.... The easiest deal to make in the world is the one where you give away the property of someone that is not at the table.... And that was not clear to me in looking at the plan, frankly, [ ] whether I

her buyout claim as arising post-petition, for she instituted the buyout proceeding on August 5, 1996, after the Debtor's May 31, 1996 bankruptcy filing. (Tr. Dec. 29, 1997 at 46 ("As a post-petition, pre-confirmation creditor, she has to be dealt with by the Plan.")) The Liquidating Agent, in his closing argument, pointed out that although Ms. Hobson's filing of the buyout claim occurred post-petition, her rights giving rise to that claim in the Dutch courts arose pre-petition, i.e. when the Debtor used his majority position in Blockless unilaterally to extend the maturity date of the Loans. The Liquidating Agent therefore considered the buyout claim to be a pre-petition claim because that is when Ms. Hobson's right to institute the buyout proceeding in the Dutch courts accrued. (Tr. Dec. 29, 1997 at 58–59; *see also* Debtor's Opp. at 19, where in the context of discussing the issues of international law the' Debtor states that "Ms. Hobson's [claim] is a pre-petition claim [b]ecause it was the Debtor's alleged pre-petition conduct in February 1996 (i.e., causing the extension of maturity of the Blockless Loans) that gave rise to Ms. Hobson's claim under section 343 of the Dutch Civil Code .") Ms. Hobson's counsel claimed creditor status regarding the buyout claim for the first time in closing argument, asserting that it was a post-petition claim. (Tr. Dec. 29, 1997 at 64 ("She is a post-petition creditor." [9])) At the end of the confirmation hearing, the bankruptcy court told the Debtor's counsel that Ms. Hobson's buyout claim would have to be dealt with in the Plan. (Tr. Dec. 29, 1997 at 127, 129–30.) Subsequently, paragraph 13.6 was added to the Plan, and the Plan was confirmed by the bankruptcy court on December 31, 1997. Although this provision has already been quoted, it is reproduced here for ease of reference:

13.6 In the event that (I) Karen L. Hobson ("Hobson") obtains a final non-appealable order or judgment by a court of competent jurisdiction directing that the Debtor purchase her shares of stock in Blockless or obtains a final nonappealable judgment against the Debtor as a result of her efforts to compel the Debtor to purchase her shares of stock in Blockless, and (ii) the Debtor and/or Liquidating Agent fail to make, or cause to be made, the payment to Hobson as required under such order or judgment: Hobson shall have a claim for the unpaid portion of said required payments (the "Buyout Claim") and the Buyout Claim shall be afforded treatment identical to that for holders of Class 6 Claims under the Plan. Upon payment to Hobson on account of her Buyout Claim, in the manner accorded to Class 6 Claimholders, she shall deliver to the Liquidating Agent her shares of stock in Blockless.

On this appeal Ms. Hobson has taken inconsistent positions arguing both that she was and was not a creditor. (*Compare* Hobson's Brief at 35 ("[Ms.] Hobson's due process rights were ... violated because the Debtor failed to list Hobson as a creditor") *with* Hobson's Reply at 18 ("Ms. Hobson is not a creditor as that term is defined in the Bankruptcy Code")). The Debtor opposes her argument that she was deprived of due process because she was not scheduled as a creditor by claiming, not unreasonably, that "she chose to avoid participation in the bankruptcy case until the last moment (and now wants to use her·decision not to participate in the bankruptcy proceeding as a reason for stating that [she] was somehow denied due

---

was ignoring a problem, such as the buyout right.... [You want] the court to keep that Dutch court at bay. I am not happy with that at all.... So you are going to have a right [of Ms. Hobson's] with zero remedy against a non-Debtor entity [Blockless]. That sounds to me like you have not really dealt with the problem. (Tr. Dec. 29, 1997 at 27, 28, 30, 34.)

9. It is possible that Ms. Hobson's prior testimony at the confirmation hearing regarding the buyout claim could be seen as an assertion that she is a creditor, but the point was not explicitly made (Tr. Dec. 22, 1997 at 177–78). The bulk of her

testimony concerned the Debtor's obligations to, and Ms. Hobson's interest in, Blockless. (*Id.* at 175–77, 178–98.) (*Cf.* Debtor's Opp. at 33 ("Until Ms. Hobson's testimony at the confirmation hearing, there was no reference or any suggestion that Ms. Hobson was a creditor of the Debtor by virtue of the Buyout Procedure."); *but cf.* Tr. Dec. 18, 1997 at 62, statement of Debtor's counsel, which was not contested: "[Ms. Hobson] has conceded, and conceded at deposition, that she is not a·creditor. And she has conceded at deposition that she is going to appear as a party in interest.")

process)." (Debtor's Opp. at 34.) Given this confusion, it is imperative that Ms. Hobson's status be resolved before her due process arguments are analyzed. The court concludes that Ms. Hobson's buyout claim against the debtor is a pre-petition claim, and she is a creditor. The reasoning leading to that conclusion is as follows.

Under the Bankruptcy Code, a "creditor [is] an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10). The filing of a voluntary bankruptcy petition "constitutes an order for relief." 11 U.S.C. § 301. Thus, " '[c]reditor' is defined to include only holders of prepetition claims against the Debtor." H.R.Rep. No. 95–595 at 309, 1978 U.S.C.C.A.N. at 6266; *see also* Lawrence P. King, 7 *Collier on Bankruptcy* § 1126.02[1] at 1126–4 n. 1 (15th ed.1998). The Code defines "claim" broadly as a

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

11 U.S.C. § 101(5)(A). "Congress intended by this language to adopt the broadest available definition of 'claim.' " *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991). "The plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation...." *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559, 110 S.Ct. 2126, 2131, 109 L.Ed.2d 588 (1990). The reason Congress provided for such a broad definition is so that " 'all legal obligations of the Debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy.' " *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 200 (4th Cir.1988) (quoting H.R.Rep. No. 95–595, at 309 (1977), S.Rep. No. 95–989 at 21–22, 1978 U.S.C.C.A.N. 5787, 5807–08 and 6266). The Fourth Circuit has rejected an interpretation of "claim" that would require a right to the immediate payment of money before the

claim is deemed in existence; rather, "when the acts constituting the tort or breach of warranty have occurred prior to the filing of the petition," a claim exists for bankruptcy purposes. *Id.* at 203 (holding that contingent claim for injury from Dalkon Shield arose "when the Dalkon Shield was inserted in the claimant prior to the time of filing of the petition," regardless that the claimant's eventual right to recovery "depends upon a future uncertain event, that event being the manifestation of injury from use of the Dalkon Shield"; and approving a plan's designation of a class of "Future Tort Claimants"); *see also In re Thompson*, 182 B.R. 140, 153 (Bankr.E.D.Va.1995) (applying *Grady* analysis to contract claim, holding that debtor's "right to payment for retirement benefits arose when he joined the police department in 1969, and thus became a participant in the plan [notwithstanding that] his right to receive retirement benefits depended on his obtaining 25 years of creditable service"); *In re Edge*, 60 B.R. 690, 694 (Bankr.M.D.Tenn. 1986) (holding claim for medical malpractice arose at time of misconduct, even though the injury was first discovered post-petition).

Ms. Hobson's buyout claim arose under Dutch law when Mr. Travelstead unilaterally extended the maturity date of the Loans from Blockless. That the claim was contingent (because Ms. Hobson had to institute and be successful in a buyout proceeding under Dutch law) and unliquidated (because the value of her 20% interest has yet to be determined) is irrelevant to the question of when the claim arose. Ms. Hobson is thus a creditor with a pre-petition buyout claim, and the bankruptcy court accordingly was correct in holding that the claim would be discharged upon confirmation of the a plan. *See* 11 U.S.C. § 1141(d)(1)(A) ("the confirmation of a plan ... discharges the debtor from any debt that arose before the date of such confirmation").[10]

### 2. *Notice*

■ Bankruptcy Rule 2002(b) provides:

---

**10.** The bankruptcy court did not specify in its order whether the claim arose pre- or post-petition. (Mem. Suppl'g Reasons Given During

Conf.Hrg. for Conf'g Plan, entered December 31, 1997 (Bankr.Dkt. No. 612).)

[T]he clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees not less than 25 days notice by mail of (1) the time fixed for filing objections and the hearing to consider approval of a disclosure statement; and (2) the time fixed for filing objections and the hearing to consider confirmation of a . . . Chapter 11 . . . plan.

Because Ms. Hobson is a creditor by virtue of her buyout claim, she should have been scheduled by the Debtor as a creditor and given notice under this Rule. The error was harmless, however. Ms. Hobson knew of the Debtor's bankruptcy at least as early as June 16, 1996, for in a paper filed in the District Court of Rotterdam she noted the Debtor's May 31, 1996 bankruptcy petition filed just 17 days before. (*See* Hobson Conf.Hrg.Exh. 13, at 7, ¶ 9.) Moreover, she filed objections to the Plan and Disclosure Statement both before and after the Confirmation Hearing, (Bankr.Dkt.Nos.586–89, 606), appeared at the hearing and presented evidence, including herself as a live witness, and cross-examined every other witness present at the hearing. Compliance with this Rule could not have affected the case, thus its violation is no ground for overturning the bankruptcy court's confirmation. *See In re American Dev. Int'l Corp.*, 188 B.R. 925, 934 (N.D.Tex. 1995) ("In bankruptcy, a procedural rule requiring notice is adequately complied with by procedure whereby a party not receiving formal notice does receive actual notice and has some available remedy to set aside the judgment." *In re Toth*, 61 B.R. 160, 166 (Bankr. N.D.Ill.1986) (citing *In re Park Nursing Ctr., Inc.*, 766 F.2d 261, 263 (6th Cir.1985)).); *In re Glinz*, 66 B.R. 88, 91 (D.N.D.1986) ("There is no showing that the attorney could have made any arguments with 20 days notice by mail that he could not have made with the actual notice he received at the hearing."); *Fraidin v. Weitzman (In re Fraidin)*, 188 B.R. 529, 532 n. 1 (D.Md.1995) (alternate holding), *aff'd* 110 F.3d 59 (4th Cir.1997) (table); 11 U.S.C. § 102(1) (" 'after notice

and a hearing' or a similar phrase means [ ] after such notice as is appropriate in the particular circumstances").

Thus, any Rule 2002(b) violation was harmless error.

### 3. *Limitation on Ms. Hobson's Evidentiary Presentation at the Hearing*

■ Ms. Hobson claims that the bankruptcy court improperly limited the scope of her evidentiary presentation to issues involving Blockless and the Blockless stock, in violation of 11 U.S.C. § 1109(b). As explained previously, the court did so based on her position that she was not a creditor, but was appearing to protect her minority shareholder interest in Blockless. Now, however, on this appeal Ms. Hobson argues that "[b]ecause the source of payment of Class 6 claims is not limited to the Blockless asset, the valuation of all the Debtor's assets is relevant to, and will affect the ultimate payout to, the Class 6 claimants. Hobson should therefore have been allowed to ask questions and introduce evidence relating to assets other than Blockless." (Hobson's Reply at 9.) Had she presented this theory of relevance to the bankruptcy court, and had the court rejected it, it might present a ground for reversal on appeal, depending on what evidence she might have proposed to introduce. But she did not do so. Under Fed.R.Evid. 103,

[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which the questions were asked.

Fed.R.Evid. 103(a)(2).[11] Ms. Hobson proffered no evidence that related to anything but Blockless, her proposed exhibits at the confirmation hearing pertained only to Blockless, (*see* Bankr.Dkt. No. 593, Exs. 1–27), her own testimony related only to Blockless, and counsel's cross-examination of the Debtor, with one irrelevant exception,[12] related only

---

**11.** The Federal Rules of Evidence are applicable in bankruptcy proceedings. Fed.R.Bankr.P. 9017 ("The Federal Rules of Evidence and Rules

43, 44 and 44.1 F.R.Civ.P. apply in cases under the Code.")

**12.** The single exception was a question directed to the Debtor on cross-examination regarding an

to Blockless. She claims that her failure to present other evidence (the substance of which remains unrevealed even on this appeal) was due to her respect for the court's ruling that her presentation should be limited to Blockless. But a review of the confirmation hearing transcript shows otherwise, for she never voiced a theory of admissibility apart from her minority interest in Blockless.[13] Her written objections to the Plan failed to assert she was a creditor. (*See* Bankr.Dkt. Nos. 588, 606.) Ms. Hobson's attempt now to assert that the evidence should have been admitted because she was a creditor comes too late. *See e.g., Reese v. Mercury Marine*, 793 F.2d 1416, 1421 (5th Cir.1986) (holding product liability defendant's failure to articulate theory of admissibility based on adequacy of warning was unreviewable when defendant argued for, and the district court rejected, admissibility based on relevance to the issue of causation);

*see also Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1140 (5th Cir.1985) ("We review the district court's ruling only for its correctness in rejecting the proffer actually made").

A thorough review of the transcript shows that the bankruptcy court allowed Ms. Hobson broad cross-examination of all the Debtor's witnesses, overruled a number of the Debtor's objections to that questioning, and exhibited substantial patience in the face of sometimes redundant, marginally relevant, or argumentative questioning. (*See* Tr. Dec. 22, 1997 at 7–72, 85–109, 122–126, and 145–163.) Based upon the theory of relevance Ms. Hobson espoused, vis-a-vis her minority shareholder interest in Blockless, it was not error to limit her presentation to matters affecting Blockless. Although § 1109(b) does allow a party in interest to "be heard on any issue in a case under [Chapter 11]," it does not obviate generally applicable rules of standing;

---

asset unrelated to Blockless. When the Debtor's counsel objected to the question, Ms. Hobson's counsel stated only that the purpose of the question was to test the Debtor's credibility; there was no argument regarding its relevance to payment of Ms. Hobson's buyout claim. (Tr. Dec. 22, 1997 at 19.)

13. The Court: I find it hard to conceive of three hours worth of cross-examination that I would consider relevant to the issues before us. Your client, as I have said, has an interest in this proceeding. She is not a creditor. Her interest in the proceeding is in an asset that is an integral part of this proceeding, which is the Blockless asset.

Mr. Goodman: Yes, Your Honor.

The Court: So it seems to me that your questions would be directed to the Blockless asset and how it fits into this equation.

Mr. Goodman: Yes, Your Honor.

The Court: Even with that, your objection simply incorporated the extensive memorandum you filed in a separate adversary proceeding. So I don't want this cross-examination [to be] simply a discovery deposition for the adversary proceeding but rather it should be limited and restricted to the role of that asset in this proceeding.

Mr. Goodman: Your Honor, if I may address that.

The Court: Okay. So with that I want you to be ... wary when you are asking the questions that I am not going to just allow an open-ended slate for you to write on.

....

Mr. Goodman: My questions will be directed toward Blockless, the ownership of Blockless,

the control of Blockless, the judgments against Blockless, and the interest people assert in Blockless.

The Court: That may not be narrow enough, but we will deal with it.

(Tr. Dec. 18, 1997 at 125–26.) Having previously heard Ms. Hobson's counsel claim that she was not a creditor, and after she had failed to contest the Debtor's assertions that she was not a creditor, the court reasoned that her interest in the proceeding derived through her status as a shareholder in Blockless. The court also expressed concern that cross-examination not be employed as a fishing expedition for evidence usable in another proceeding. The court acted appropriately in fulfilling its responsibility to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth [and] (2) avoid needless consumption of time...." Fed.R.Evid. 611(a). If Mr. Goodman (Ms. Hobson's counsel) did not agree with the court's understanding of Ms. Hobson's reason for appearing in the case, it was incumbent upon him to say so in order to preserve the issue for review on appeal. But he did not, and at the continuation of the confirmation hearing several days later he repeated that what he intended to cover in cross-examining the Debtor pertained only to Blockless. (Tr. Dec. 22, 1997 at 6–7.) Given this context, it is clear that the bankruptcy court did not overrule an argument that Ms. Hobson's presentation of evidence on issues other than Blockless was relevant to her status as a creditor by virtue of the buyout claim; rather, Ms. Hobson made no such argument to the bankruptcy court.

rather, "all the section means is that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains, thus making explicit what is implicit in an in rem proceeding—that everyone with a claim to the res has a right to be heard before the res is disposed of since that disposition will extinguish all such claims." *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir.1992).

For the foregoing reasons, Ms. Hobson's claim that she was denied rights under 11 U.S.C. § 1109(b) presents no ground for reversal of the confirmation order.

### 4. *Denial of Voting Rights*

■ Ms. Hobson contends that the Debtor's failure to schedule her as a creditor deprived her of her right to vote on the Plan under 11 U.S.C. § 1126(a) ("The holder of a claim or interest . . . may accept or reject a plan.") The short answer to this argument is that Ms. Hobson, having actual notice of the bankruptcy case, never attempted to vote. Because she never presented this argument to the bankruptcy court, it is now waived.

■ Even if this claim has not been waived, any error there might have been was harmless, because Ms. Hobson's vote could not have impeded confirmation of the Plan. *See In re A.H. Robins Co.*, 880 F.2d 694, 698 (4th Cir.1989) ("We do not decide whether the district court's voting procedure violated § 1126(c) because, in view of the outcome of the vote, the challenged procedure was at most harmless error"). Because Ms. Hobson also asserts the denial of her right to vote on the Plan in the context of asserting that her buyout claim was improperly classified in Class 6 of the Plan, explanation of why the error was harmless will be delayed until that discussion. The reasons why her vote could not have affected the outcome will be more easily understood after review of certain provisions in 11 U.S.C. § 1129, which pertains to the requirements for confirmation of a plan, and permits confirmation in some circumstances even over dissenting creditors or classes of creditors. *See infra* section II.B.2. It is to those provisions of § 1129 that I now will turn.

### B. *Section 1129 Confirmation: Feasibility and Cram Down*

A Chapter 11 reorganization plan normally may be confirmed only if all the requirements of § 1129(a)(1–13) are met. "Section 1129 was enacted to encourage 'consensual' reorganization plans." 4 *Norton Bankruptcy Law and Practice 2d* § 93:1 at 93–2 (1994). Subsection (a) provides for creditor voting to encourage the debtor and creditors to collaborate on an acceptable plan. *Id.* If, however, the § 1129(a)(8) requirement that all impaired classes accept the plan is not met, a plan may still be confirmed if it meets the remaining § 1129(a) requirements and also meets the requirements of § 1129(b), that the plan "does not discriminate unfairly, and is fair and equitable" with respect to impaired classes which have not accepted the plan. 11 U.S.C. § 1129(b)(1). Section 1129(b) is called the "cram down" provision; as indicated, it allows confirmation of a plan over the objection of dissenting classes. *Bryson*, 961 F.2d at 500 n. 3; *see also* H.R.Rep. No. 95–595 at 413, 1978 U.S.C.C.A.N. at 6369.

Ms. Hobson asserts that the bankruptcy judge erred in finding that the Debtor's Plan met certain of these requirements, thus mandating reversal of the court's confirmation of the Plan. Specifically, Ms. Hobson claims that the Plan (1) was not feasible (subsection 1129(a)(11)); (2) improperly classified her claim (section 1122(a), incorporated by subsection 1129(a)(1)); (3) was not fair and equitable to dissenting classes (subsection 1129(b)(1)); and (4) was not in the best interest of dissenting creditors (subsection 1129(a)(7)).

### 1. *Feasibility*

■ Section 1129(a)(11), commonly called the "feasibility" standard, prohibits confirmation of a plan unless

[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

A bankruptcy court should "scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir.1985) (quotation omitted). "[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *In re Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988) (citation omitted). " 'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.' " 7 *Collier on Bankruptcy, supra,* ¶ 1129.0301 at 1129–65 (quoting *In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460 (10th Cir.1985) (quoting *In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th Cir.1985) (internal quotation omitted))). "A plan does not fail the feasibility test if there is a possibility, or even a probability, of a liquidation under the plan, so long as the means for a liquidation 'is proposed in the plan.' " *In re Cellular Info. Sys., Inc.,* 171 B.R. 926, 945 (Bankr.S.D.N.Y. 1994) (quoting 11 U.S.C. § 1129(a)(11)).

 The Plan is a liquidating plan [14] which appoints a Liquidating Agent possessed of "all of the rights, duties and powers of a trustee including, but not limited to those set forth in §§ 704(1) and 1106 of the Bankruptcy Code." (Plan, ¶ 6.5(a) at 23.) Section 704(1) of the Code obligates a trustee (and in this circumstance the Liquidating Agent) to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(1). Although the Plan provides that upon confirmation title to all property of the estate revests in the Debtor, the Debtor is prohibited from "interfer[ing] in any way with the Liquidating Agent's powers or efforts to liquidate assets and pay creditors...." (Plan, ¶¶ 5.1,

5.3 at 16–17; *cf.* 11 U.S.C. § 1107(a) ("a debtor in possession ... shall perform all the functions and duties [with limited exceptions not relevant here] of a trustee serving in a case under this chapter").)

Ms. Hobson contends, however, that the Plan is not feasible because it provides inadequate assurance that the Debtor's interest in Blockless will be liquidated. She argues that the Bankruptcy court erred in finding the Plan feasible, first, "[b]ecause the Plan does not commit the Debtor to give a proxy of his voting rights to the Liquidating Agent." (Hobson's Brief at 34.) The bankruptcy court found, however, that the Debtor's testimony expressing his willingness to cooperate fully with the Liquidating Agent, when considered in light of "the ease of enforcing against him the duty to grant a proxy to vote stock" provided the requisite feasibility, "specifically when combined with the fact that there are sufficient assets outside of the Blockless assets to pay most, if not all, of the claims in this case." (Tr. Dec. 29, 1997 at 133–34; *see also* Tr. Dec. 18, 1997 at 112 (testimony of the Debtor that, in the event of a disagreement over how to vote the Debtor's Blockless shares, "I fully would accept the Liquidating Agent's desires"); *id.* at 109; Tr. Dec. 22, 1997 at 77.)

Second, Ms. Hobson argues that the Plan is not feasible because it "contains no guarantee that [the independent managers of] Blockless will cooperate with the Debtor or the Liquidating Agent to liquidate the Blockless Stock or the Underlying Blockless Assets." (Hobson's Brief at 34.) The Debtor asserts, and Ms. Hobson does not contest, that under Blockless's Articles of Association the policies of the company are determined by the general meeting of the shareholders, and a majority vote controls; thus as a practical matter, the Debtor or his designee can determine Blockless's actions. (*See* Debtor's Opp. at 30, citing Hobson's Conf.Hrg.Ex. 26,

---

**14.** "The primary function of Chapter 11 is for the reorganization of a business, although liquidation plans are authorized. 11 U.S.C. § 1123(b)(4)." *In re Naron & Wagner, Chartered,* 88 B.R. 85, 89 (Bankr.D.Md.1988); *see also* 11 U.S.C. § 1123(a)(5)(D) (authorizing a Chapter 11 Plan to provide for the "sale of all or any part of the property of the estate"); *In re Sandy Ridge*

*Dev. Corp.,* 881 F.2d 1346, 1352 (5th Cir.1989) ("the distribution of property to creditors under a liquidating Plan of reorganization is not per se improper under the Code"); H.R.Rep. No. 95–595 at 407, 1978 U.S.C.C.A.N. at 6363; *cf.* 4 *Norton Bankruptcy L. & Prac.2d* § 75:1 at 75–2 n. 2 ("the Code contains no definition of 'reorganization,' a pivotal term in Chapter 11").

arts. 10 and 13.) The bankruptcy court found as to this issue that the Debtor's stockholder rights gave "sufficient likelihood that the Plan can be implement[ed] with respect to Blockless." (Tr. Dec. 29, 1997 at 136.)

Contrary to Ms. Hobson's assertions, made without citation to legal authority, the feasibility standard does not require a "guarantee" that the Debtor or Liquidating Agent will be able to cause the Debtor's interest in Blockless to be liquidated. The bankruptcy court found that "there is a mechanism in place that produces the likelihood that [the] result will be achievable." (Tr. Dec. 29, 1997 at 133.) The bankruptcy court applied the correct legal standard, and its findings of fact are not clearly erroneous. *See In re Kane,* 843 F.2d 636, 650 (2d Cir.1988) (holding that "[t]he Bankruptcy Court's finding that the Plan offers reasonable assurance of success . . . is not clearly erroneous") (citing *Monnier,* 755 F.2d at 1341 (applying clearly erroneous standard to feasibility determination); *In re Pizza of Hawaii, Inc.,* 761 F.2d at 1377 (same)).

### 2. *Classification of Claims*

One of the thirteen § 1129(a) prerequisites to confirmation of a Plan is that the "plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Section 1122, governing classification of creditors, is one of these "applicable provisions." *In re AOV Indus., Inc.,* 792 F.2d 1140, 1150 (D.C.Cir.1986) (citing H.R.Rep. No. 95–595 at 412, 1978 U.S.C.C.A.N. at 6368). Under § 1122(a), (with exceptions not relevant here) "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Section 1122(a) is permissive rather than

mandatory; however, "although separate classification of similar claims may not be prohibited, it 'may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.'" *Bryson,* 961 F.2d at 502 (quoting *In re Greystone III Joint Venture,* 948 F.2d 134, 139 (5th Cir.1992) (as amended)).

Ms. Hobson argues that the bankruptcy court erred in treating her as a Class 6 unsecured creditor rather than putting her in her own separate unsecured class. (She then contradicts herself in her Reply brief, asserting that her buyout claim is, after all, substantially similar to Class 6 claims.) The court need not resolve the classification question, however, for the following reasons. As previously explained, if any class of impaired claims fails to accept the Plan under § 1129(a)(8), then the requirements for cram down under § 1129(b) must be met. Because in this case at least one impaired class failed to cast a vote either way,[15] the Plan may be confirmed, if at all, only under the cram down provisions of section 1129(b). *See In re Wallace,* 61 B.R. 54, 58 (Bankr.W.D.Ark.1986) (holding that, in absence of evidence of whether each impaired class has accepted or rejected the plan, confirmation could only be had under the cramdown requirements of § 1129(b)). Ms. Hobson claims that, had her buyout claim been separately classified, her class of one would have voted under 11 U.S.C. § 1126(a) to reject the Plan, thus triggering the cram down requirements of section 1129(b). But because the cram down requirements are triggered regardless how her claim is classified, any alleged error in the bankruptcy court's classification was harmless.[16] *See A.H. Robins,* 880 F.2d at 698 (4th

---

15. Classes 1, 2 and (possibly) 4 were impaired and did not cast a vote. (Tr. Dec. 18, 1997 at 78; *see also* Bankr.Ct. Docket No. 591.)

16. Additionally, for a Plan to be confirmable, at least one class of impaired claims must affirmatively have accepted the Plan. 11 U.S.C. § 1129(a)(10). Counsel for the Debtor represented to the bankruptcy court that Classes 3 and 5 both voted to accept the Plan. (*See* Tr. Dec. 18, 1997 at 77–79 (Class 3); Tr. Dec. 29, 1997 at 4–5 (Class 5).) Ms. Hobson neither challenged those

representations when they were made, nor does she do so in this appeal. Thus, her assertion that she was improperly classified to manipulate voting, i .e. to manufacture at least one impaired class that would vote to approve the Plan, is rejected. No matter how her claim was classified, it could have had no effect on the Class 3 and 5 votes, either of which alone was sufficient to satisfy 11 U.S.C. § 1129(a)(10). *Cf. Bryson,* 961 F.2d at 502 (reversing confirmation order where separate "classification [was] clearly for the purpose of manipulating voting" and without

Cir.1989) ("We do not decide whether the district court's voting procedure violated § 1126(c) because, in view of the outcome of the vote, the challenged procedure was at most harmless error."); *Kane*, 843 F.2d at 647 (declining to decide whether a plan's "voting procedures violate the Code because, in view of the outcome of the vote, the alleged irregularities were at most harmless error"); *cf. In re Colorado Corp.*, 531 F.2d 463, 470 (10th Cir.1976) (denial of creditors' right to vote for trustee was not harmless error where "their votes could have affected, and probably would have altered, the outcome").

I thus decline to decide the classification issue because any error would have been harmless.

### 3. *Cramdown and the Absolute Priority Rule*

■ Ms. Hobson did not in the bankruptcy court object to confirmation of the Plan on the basis of the absolute priority rule, as she does now. She claims in her reply brief that she did object on this basis but a review of the "Letter Objections" she filed after the confirmation hearing, to which she cites, reveals no such objection. (*See* Hobson's Reply at 18, citing Letter Objections, filed December 30, 1997, Bankr.Dkt. No. 606.) Accordingly, that argument is waived. *See Karpel v. Inova Health System Servs.*, 134 F.3d at 1222, 1227 ("issues raised for the first time on appeal generally will not be considered"). In the interest of completeness, however, and recognizing the likelihood of further appeal, it will be discussed.

■ Section 1129(b), the cram down provision, requires that a plan be "fair and equitable" before it can be confirmed over the objection of dissenting creditors. 11 U.S.C. § 1129(b)(1); *Bryson*, 961 F.2d at 503 (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. at 966, 99 L.Ed.2d

169 (1988)). A plan is fair and equitable with respect to a class of unsecured claims if

(I) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B)(I–ii). This statutory provision, which has its roots in judicial interpretations of the Bankruptcy Act of 1898, is called the "absolute priority rule." As restated by the Supreme Court, the absolute priority rule requires that " 'a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.' " *Bryson*, 961 F.2d at 503 (alteration in original) (quoting *Ahlers*, 485 U.S. at 202, 108 S.Ct. at 966.)

Ms. Hobson argues that the absolute priority rule is violated because the Plan, pursuant to an agreement reached between the Debtor and the Liquidating Agent, (*see* Plan ¶ 5.7 and Bankr.Dkt. No. 603), gives the Debtor a $13,000 monthly allowance from the funds of the bankruptcy estate for living expenses. The key word in the statute, however, is that the plan *provides* for the satisfaction of senior claims. It is not a rule of timing, but of provision "as of the effective date of the plan." 11 U.S.C. § 1129(b)(2)(B)(I). A bankruptcy court's findings that all senior claims will be paid, with interest, "are tantamount to actual payment." *In re Johnston*, 21 F.3d 323, 331 (9th Cir.1994) (holding that Debtor's Plan providing him with $50,000 per month for living expenses before senior creditors were actually paid did not violate absolute priority rule where bankruptcy court's uncontested findings predicted that all claims would be paid in full, with interest) [17]; *see also* H.R.Rep.

---

the vote of the gerrymandered class the plan could not have been crammed down because there would have been no impaired accepting class).

17. The court in *Johnston* emphasized that the bankruptcy court's findings were uncontested, but there appears to be no reason not to apply the court's reasoning in the present situation where the bankruptcy court's findings, although contested, are not clearly erroneous.

No. 95–595 at 358, 1978 U.S.C.C.A.N. at 6314 ("The priorities established in [section 507[18]] do not require that the claims listed be paid temporaly [sic] in the order listed.").

Thus, Ms. Hobson's contention that the absolute priority rule was violated is waived on appeal, or, in the alternative, is rejected on the merits.

### 4. *Best Interest of Creditors Test*

■ As with the absolute priority rule issue just discussed, Ms. Hobson made no objection to the Plan in the bankruptcy court on the basis of the best interest of creditors test. (*See* Hobson's Reply at 18, citing Letter Objections, filed December 30, 1997, Bankr.Dkt. No. 606.) Accordingly, that argument is waived. *See Karpel*, 134 F.3d at 1227 ("issues raised for the first time on appeal generally will not be considered"). As with the absolute priority rule claim, in the interest of completeness and recognizing the likelihood of further appeal, the issue will be discussed.

■ 11 U.S.C. § 1129(a)(7) incorporates the "best interest of creditors" test and requires a finding that each holder of a claim or interest either has accepted the Plan or has received no less under the Plan than what she would have received in a Chapter 7 liquidation. *See Kane*, 843 F.2d at 649. The bankruptcy court's findings regarding feasibility under § 1129(a)(11), previously discussed, are sufficient to satisfy the best interest of creditors test in this case, for the Plan provides for full repayment of all claims, with interest. *See A.H. Robins*, 880 F.2d at 698 (treating best interest of creditors test under § 1129(a)(7), and feasibility test under § 1129(a)(11), as presenting the same inquiry where plan provided for all claims to be paid in full).

■ Additionally, the bankruptcy court reasonably credited the testimony of the Debtor's accountant, Charles R. Goldstein, a member of the public accounting firm C.W. Amos. A liquidation analysis prepared by Mr. Goldstein was also admitted into evidence.

Mr. Goldstein testified, based on his liquidation analysis, that he would expect the liquidation provided for in the Plan to yield more than a Chapter 7 liquidation because of the differences in timing of the sales of assets under the Plan and under Chapter 7, and the Debtor's agreement to cooperate with the Liquidating Agent in managing and patiently liquidating his complex portfolio of international assets. (Tr. Dec. 22, 1997 at 119–20); *see* Fed.R.Bankr.P. 8013 ("due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses"). Although Ms. Hobson claims that the Debtor failed to show that a Chapter 7 trustee would have less than two years to liquidate, and that he failed adequately to show that the return to creditors under the Plan would "exceed" that under Chapter 7, (Hobson's Reply at 16), neither such showing was required. Section 1129(a)(7) requires, not that the return to each creditor under a Chapter 11 Plan exceed the return under a Chapter 7 liquidation, but only that it be "not less than" the return under Chapter 7—in other words, at least equal. 11 U.S.C. § 1129(a)(7)(A)(ii).

Ms. Hobson's argument that the Plan violates the best interest of creditors test is waived on appeal. In the alternative, for the foregoing reasons the bankruptcy court's finding that the Plan satisfies that test is not clearly erroneous. *See Kane*, 843 F.2d at 649 (applying clearly erroneous standard of review to best interest of creditors test).

### C. *Abstention Based On International Comity*

Section 541 of the Bankruptcy Code provides that the commencement of a bankruptcy case creates an estate "comprised of" the debtor's eligible property "wherever located and by whomever held." 11 U.S.C. § 541. Section 1334(e) of the Judicial Code provides further that in a bankruptcy case the district court "shall have exclusive jurisdiction of all the property, wherever located...." 28 U.S.C. § 1334(e).[19] Relying on the language

---

**18.** 11 U.S.C. § 507 establishes the priority of claims against a bankruptcy estate, and is applicable to a Chapter 11 plan, *see* 11 U.S.C. §§ 103(a), 1129(a)(9).

**19.** 28 U.S.C. § 157(a) authorizes referral of

of these two sections, courts have held that the Bankruptcy Code has extraterritorial reach, and therefore *in rem* jurisdiction is proper with respect to property abroad in which a U.S. debtor has an interest. *See In re Nakash*, 190 B.R. 763, 768 (Bankr. S.D.N.Y.1996) (holding automatic stay applies to actions against the debtor and his property outside the U.S.); *In re Deak & Co.*, 63 B.R. 422, 426–28 (Bankr.S.D.N.Y. 1986) (holding jurisdiction over shares of stock held outside U.S. was proper); *In re Nat'l Safe Ctr., Inc.*, 41 B.R. 195, 196 (Bankr.D.Hawai'i 1984) ("Debtor's estate is comprised of all property wherever located, not only property within the United States, but also without" (citing *In re Filipek*, 35 B.R. 339, 341 (Bankr.D.Hawai'i 1983) (holding nondisclosure of foreign assets constitutes failure to comply with § 541(a))). But even though the court may have *in rem* jurisdiction over the debtor's property, *in personam* jurisdiction is required before the court may restrain a defendant from interfering with that property. *See Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 516 (2d Cir.1975) (holding that automatic stay "cannot · be effective ... without *in personam* jurisdiction over the creditor who has begun an action in a foreign tribunal that is not within the jurisdiction of the United States"). Without personal jurisdiction, a U.S. court order would be enforceable in another country (in the absence of a treaty or convention) only to the extent that foreign courts "are moved by comity to grant it 'full faith and credit.'" *In re McTague*, 198 B.R. 428, 430 (Bkrtcy.W.D.N.Y.1996). Nevertheless, "the Debtor could seek to punish American creditors [who are subject to the court's jurisdiction] for any 'extraterritorial' violation of the discharge order." *Id.* at 430–31; *see also In re Rimsat*, 98 F.3d 956, 961 (7th Cir.1996) ("[The defendant] is a U.S. citizen, incontestably within the jurisdiction of the Congress of the United States, which can by statute (the automatic stay) forbid him to conduct proceedings anywhere in the world that would affect the debtor's property."); *Nakash*, 190 B.R. at 768–69 (holding that Israeli

Receiver, subject to personal jurisdiction of U.S. court, violated automatic stay by instituting involuntary insolvency proceedings against debtor in Israel); *In re McLean Indus.*, 68 B.R. 690, 694 (S.D.N.Y.1986) (foreign creditor, over whom bankruptcy court had jurisdiction, violated automatic stay by arresting Debtor's vessels in Hong Kong)).

■ In an appropriate case, however, a U.S. court possessed of the appropriate jurisdiction may be required on grounds of international comity to abstain from exercising that jurisdiction where conflicts with foreign law exist. The classic definition of comity was stated over a century ago by the Supreme Court in *Hilton v. Guyot:*

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). The Court has similarly explained:

> Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states. This Court referred to the doctrine of comity among nations in *Emory v. Grenough*, 3 U.S. (3 Dall.) 369, 370, 1 L.Ed. 640, n. * (1797) (dismissing appeal from judgment for failure to plead diversity of citizenship, but setting forth an extract from a treatise by Ulrich Huber (1636–1694), a Dutch jurist):
>
>> "'By the courtesy of nations, whatever laws are carried into execution, within the limits of any government, are considered as having the same effect every where, so far as they do not occasion a

bankruptcy cases to bankruptcy judges, and Local Rule 402 implements this statute in the District of Maryland.

prejudice to the rights of the other governments, or their citizens.

. . .

[N]othing would be more convenient in the promiscuous intercourse and practice of mankind, than that what was valid by the laws of one place, should be rendered of no effect elsewhere, by a diversity of law. . . .' " *Ibid.* (quoting 2 U. Huber, Praelectiones Juris Romani et hodiemi, bk. 1, tit. 3, pp. 26–31 (C. Thomas, L. Menke, & G. Gebauer eds. 1725)).

*Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for Southern Dist. of Iowa,* 482 U.S. 522, 543, 107 S.Ct. 2542, 2555 n. 27, 96 L.Ed.2d 461 (1987). "Although courts in this country have long recognized the principles of international comity and have advocated them in order to promote cooperation and reciprocity with foreign lands, comity remains a rule of 'practice, convenience, and expediency' rather than of law." *Pravin Banker Assocs. v. Banco Popular Del Peru,* 109 F.3d 850, 854 (2d Cir. 1997) (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971)). "And courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States." *Id.* (citing *Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 522 (2d Cir.1985)). "[T]he threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law." *Societe Nationale,* 482 U.S. at 555, 107 S.Ct. at 2562 (1987) (Blackmun, J., concurring in part and dissenting in part).

▇▇▇ A bankruptcy court's decision that comity does not require yielding to the foreign proceeding is reviewed on appeal for abuse of discretion. *See Rimsat,* 98 F.3d at 963; *Allstate Life Ins. Co. v. Linter Group, Ltd.,* 994 F.2d 996, 999 (2d Cir.1993), *Remington Rand Corporation–Delaware v. Business Systems, Inc.,* 830 F.2d 1260, 1266 (3d Cir.1987); *In re Colorado Corp.,* 531 F.2d at

467. Additionally, "comity is an affirmative defense" and therefore the party seeking to have a U.S. court extend comity bears the burden of proving that comity is appropriate. *Allstate,* 994 F.2d at 999.

▇▇▇ Ms. Hobson concedes or at least does not contest that the bankruptcy court had *in rem* jurisdiction over the Debtor's 80% shareholder interest in Blockless, (*see* Hobson's Reply at 4 n. 1 ("No party is asserting that the Bankruptcy Court does not have in rem jurisdiction over the Blockless stock")), but asserts that the Dutch courts have concurrent, primary jurisdiction over that stock. Ms. Hobson also does not contest that the court has personal jurisdiction over her.

Addressing the threshold comity question, conflict with foreign law, Ms. Hobson asserts that the Plan as confirmed conflicts with the Dutch court orders in two ways. First, as to Blockless's Class 2 secured claim, the May 9, 1996 Dutch judgment requires Blockless to collect the Loans from the Debtor immediately or forfeit penalty payments to Ms. Hobson, while the Plan provides that the Loans may be repaid within two years. Second, as to Ms. Hobson's Class 6 unsecured buyout claim, the Dutch judgment requires "full payment of the Buy Out Price *at the same time* she tenders her shares on a time schedule established under Dutch law," while under the Plan the "Debtor and the Liquidating Agent may choose not to pay Hobson the Buy Out Price when she tenders her shares; rather, Hobson may be paid only part of the Buy Out Price, while the remainder would be converted into a general unsecured claim on par with the Debtor's other unsecured creditors." (Hobson's Brief at 25–26, emphasis in original.)

Accepting Ms. Hobson's characterization of these conflicts,[20] however, does not require a court to extend comity, but simply requires its consideration. Although Ms. Hobson makes much of the timing differences for

---

**20.** The Dutch court orders possibly may be read not to present such a direct and certain conflict, but the court need not venture into such potentially difficult problems of their interpretation. (*Cf.* Dutch judgment of January 22, 1998, ¶ 3.5:

"As long as Blockless actually and demonstrably gives shape to the required vigorousness it does not have to be afraid that it forfeits penalty payments [to Ms. Hobson].")

payment of Blockless's and Ms. Hobson's claims, it is notable that the claims themselves have been preserved. The Plan provides for both claims to be paid in full, with interest. Blockless's claim was scheduled in the Plan as submitted by the Debtor, and the bankruptcy court was scrupulously careful to preserve Ms. Hobson's buyout claim, conditioning confirmation of the Plan on the Debtor's providing for it in the Plan—even after, as previously discussed at length in the context of her due process claims, Ms. Hobson had taken the position that she was not a creditor. It appears to this court that the Plan defers to the Dutch judgments far more than it conflicts with them, for it allows the validity of both Blockless' and Ms. Hobson's claims against the Debtor to be determined under Dutch law.

Ms. Hobson relies extensively on *In re Spanish Cay Co., Ltd.*, but that case is largely inapposite because there the court found abstention "appropriate ... since (1) the Debtor is a Bahamian company and (2) the Debtor's principal asset is real property located in the Bahamas." *In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 725 (Bankr.S.D.Fla. 1993) (" 'American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.' " (quoting *Cunard Steamship Co., Ltd. v. Salen Reefer Services AB*, 773 F.2d 452, 458 (2d Cir. 1985))). Moreover, the court's abstention was expressly conditioned on the filing of a bankruptcy proceeding in the Bahamas. *Id.* at 727. Here, by contrast, the Debtor is an American citizen, as is Ms. Hobson, and the spectre of parallel bankruptcy proceedings in the Netherlands has not been raised. *Cf.* 11 U.S.C. §§ 304 and 305 (providing for, *inter alia,* proceedings ancillary to pending foreign bankruptcy proceeding, or dismissal due to the existence of such proceedings). While there do exist in *Spanish Cay* some minor factual similarities to this case, the important factors upon which the court based its abstention holding are not present here.

Ms. Hobson also notes that no treaty exists between the U.S. and the Netherlands regarding the reciprocal recognition of foreign judgments or bankruptcy proceedings. *See Remington Rand* 830 F.2d at 1268. A Dutch court may or may not respect a U.S. bankruptcy court's judgment regarding the disposition of property of a debtor, but that has not been shown. *Compare Remington Rand,* 830 F.2d at 1268 (indicating that Dutch courts might recognize U.S. judgments, " '[a]lthough the findings of the foreign court are not conclusive on the Dutch court: the latter is free to attach significance to that decision as it sees fit' " (quoting H. Warendorf, *The Commercial Laws of the Netherlands* 17 (1981)) *with* Ronald De Ruuk, *Foreign and Multinational Business Insolvency—The Netherlands, in Multinational Commercial Insolvency,* P–1, P–12 (ABA 1993) ("There is no recognition or enforcement of foreign judgments or orders unless a (bilateral or multilateral) treaty provides for such recognition and/or enforcement."). Given that the bankruptcy court in confirming the Plan extended comity to the Dutch judgments in all respects but timing for their payment,[21] it would seem just and reasonable that the Dutch courts should to that extent extend their own comity to these bankruptcy proceedings. "In this respect, ... comity has to be a two-way street. Although reciprocity is no longer an absolute condition precedent to comity, it is always a permissible consideration." *Remington Rand,* 830 F.2d at 1273 (citations omitted); *cf. id.* (ordering district court to "bade fealty to the doctrine of comity and recognize the Dutch bankruptcy proceedings, but only if and to the extent that the Dutch court is willing to recognize the American judgment in its proceedings"). But, regardless of the Dutch court's willingness to grant comity to the bankruptcy court's order of discharge of the Debtor's debts (and concomitant replacement of those obligations as provided by the Plan), to the extent that Ms. Hobson's efforts in the Netherlands to enforce the Dutch judgment may violate either the automatic stay, 11 U.S.C. § 362(a), or the similar per-

---

**21.** Judge Derby cogently explained that "I don't need to go fighting with Dutch courts. There is no need for it other than the normal bankruptcy rule that may allow you to delay the payment." (Tr. Dec. 29, 1997 at 28.)

manent injunction entered along with an order of discharge, 11 U.S.C. § 524, a U.S. court, having personal jurisdiction over her, has the power to remedy her extraterritorial violations of its orders. Personal jurisdiction over Blockless, contrary to Ms. Hobson's assertion, is unnecessary to effect this result.

 For the foregoing reasons, the bankruptcy court acted well within its discretion in refusing to accord comity by deferring to the timing for payment provisions in the Dutch judgments. Indeed, its recognition of the substance of those judgments by honoring the Dutch court's jurisdiction to decide both Blockless' Class 2 and Ms. Hobson's Class 6 claims under Dutch law, while allowing the Plan to govern the timing of their payment, exhibits a careful and wise balancing of the sovereign interests at stake. "Comity is a doctrine of adjustment, not a mandate for inaction." *Rimsat,* 98 F.3d at 963. Under the circumstances of this case it is difficult to imagine how the competing interests of Dutch corporate law and U.S. bankruptcy law could have been better harmonized while still giving effect to the important policies sought to be furthered under each country's laws.

### III. *CONCLUSION*

Ms. Hobson's due process claim based on improperly excluded evidence, arising under 11 U.S.C. § 1109, is rejected because she never presented to the bankruptcy court the theory of admissibility upon which she now seeks to rely. The bankruptcy court's finding that the Plan was feasible under 11 U.S.C. § 1129(a)(11) is not clearly erroneous. Any error regarding classification of her buyout claim under 11 U.S.C. § 1122(a), denial of her voting rights under 11 U.S.C. § 1126(a), or improper notice under Fed.R.Bankr.P. 2002(b), was harmless. Her contentions regarding the absolute priority rule, 11 U.S.C. § 1129(b)(1), and best interest of creditors test, 11 U.S.C. § 1129(a)(7), are waived on appeal, but in the alternative are rejected on the merits. The bankruptcy court did not abuse its discretion in declining to extend comity to the timing provisions in the Dutch judgments. Ms. Hobson's remaining contentions have been considered and are rejected.

The bankruptcy court's order confirming the Plan and Disclosure Statement will be affirmed.