## In re CHILES POWER SUPPLY COMPANY, INC., dba Heatway Systems, Debtor.

### No. 00–60251.

United States Bankruptcy Court, W.D. Missouri.

June 14, 2001.

---

Teresa A. Generous, Greensfelder, Hemker & Gale, St. Louis, MO, for Debtor.

E. Joseph O'Neil, Robert A. McCall, Peabody & Arnold, Boston, MA, for Lexington Ins. Co.

Timothy J. Kuester, Sonnenschein, Nath, Rosenthal, Kansas City, MO, pro se.

Laurence M. Frazen, Bryan Cave LLP, Kansas City, MO, for CNA Commercial Ins.

Jean M. Golden, Cassiday, Schade & Gloor, Chicago, IL, Laurence M. Frazen, Bryan Cave LLP, Kansas City, MO, for Transportation Ins. Co. and Valley Forge Ins. Co.

Bruce E. Strauss, Merrick, Baker, Strauss, Kansas City, MO, pro se.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Chief Judge.

American States Insurance Company (American States) filed a motion to enforce this Court's channeling injunction and a motion to hold Zeidler Roberts Partnership, Inc. (Zeidler Roberts), The ECE Group, Ltd. (ECE), and Shore Tilbe Irwin & Partners (Shore Tilbe) (collectively the Defendants) in contempt for violation of the channeling injunction. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I find that the channeling injunction applies to the Defendants, but I will deny at this time American States' motion to hold the Defendants in contempt.

## FACTUAL BACKGROUND

On March 2, 1999, the Defendants joined debtor Chiles Power Supply Company d/b/a Heatway Systems (Heatway) as a defendant in a Canadian case captioned *CIBC Development Corporation v. The ECE Group, et al.,* Court File No. 97–CV–136055 (the Canadian Litigation). The Canadian Litigation involves the installation of an allegedly defective snow melting and radiant floor heating system, known as the Entran II System, in a Commerce Court complex, owned by CIBC, in Toronto, Ontario, Canada. Zeidler Roberts and Shore Tilber were the architects of the complex, and The ECE Group was the consulting engineer. Heatway is the designer of the Entran II System. That case is still pending in Canada.

On February 25, 2000, Heatway filed a Chapter 11 bankruptcy petition. Other lawsuits, in addition to the Canadian Litigation, which also alleged that the Entran II System was defective, precipitated the filing, at least in part. Prior to the bankruptcy filing, American States and other insurance carriers (collectively the Carriers) had provided insurance coverage for Heatway. As a result, the insurance policies issued by each of these companies became assets of Heatway's bankruptcy estate.

Heatway's bankruptcy schedules identified CIBC and the Defendants as contingent creditors. Heatway's Revised Disclosure Statement also disclosed the Canadian Litigation.[1] This Court has established August 30, 2002, as the last date within which to file a proof of claim for a product claim. CIBC has filed a proof of claim in the amount of $10,311,463.50. CIBC also filed a ballot supporting Heatway's Revised Amended Plan of Reorganization (the Plan). But despite receiving notice of all of the proceedings in the Bankruptcy Court, the Defendants chose not to participate in the confirmation process and have not yet filed a Proof of Claim.

On August 18, 2000, this Court confirmed Heatway's Plan. Prior to confirmation, this Court addressed the most effective way to maximize returns to all of Heatway's creditors, including both identified and unidentified Product Liability Claimants. The Carriers participated in this process. The Carriers claimed that the insurance policies only provided coverage for consequential property damage caused by Heatway's failed product, not claims for replacement of the system itself. In addition, the Carriers claimed that the policies only provide coverage for damage that occurred between March of 1991 and August of 1998. Thus, even though the policies provided Heatway with a combined umbrella of as much as $10 million, the Carriers maintained that the policies would not cover all claims of the Product Liability Claimants, and in many instances would not cover any of the claims. The Carriers and Heatway did not, however, litigate that issue prior to the bankruptcy filing. In exchange for a release of all claims against them, the Carriers agreed to establish a fund (the Insurance Fund) in the amount of $2.9 million. After August 30, 2002, the claims bar date, a trustee appointed by this Court (the Plan Trustee) will distribute pro rata the funds in the Insurance Fund in order to satisfy the allowed claims of the Product Liability Claimants. Special Article Q of the Plan contains this provision. The Plan also provided that this Court would enter a permanent channeling injunction against all released claims if the Court approved Special Article Q. The Defendants did not object to the provisions of Special Article Q, but a

---

1. Doc. # 126.

group of claimants did object (the Colorado Claimants). As a result of their objection, the Court designated the Colorado Claimants as "Exhibit A: Product Claimants excluded from the channeling injunction."[2] The Order confirming the Plan also provided as follows:

[N]o Product Claimant listed on Exhibit A shall have any recovery against the estate and its claim shall be deemed denied unless on or before September 18, 2000 such Claimant files with the Court and serves on the Plan Trustee a Notice to proceed against the Insurance Fund and be bound by the provisions of Special Article Q.[3]

In other words, Exhibit A Product Claimants, who preserved the right by participating in the confirmation process, could choose to proceed against the Carriers or the Insurance Fund, but not both. And Exhibit A Product Claimants had to make a determination on or before September 18, 2000, as to whether they wished to proceed against the Insurance Fund.

The Carriers agreed to fund the Insurance Fund in exchange for a release of all claims. And, prior to confirmation they consented to the exclusion of the claims of the Colorado Claimants. The Carriers duly contributed $2.9 million to the Insurance Fund.

On April 16, 2001, American States filed with this Court a Motion to Enforce Channeling Injunction and Motion for Contempt. As grounds for the motions, American States claims that the Defendants have continued to prosecute their cross claims against Heatway and the Carriers, including conducting discovery. According to the motions, Heatway filed a motion in the Canadian Litigation to enforce this Court's Confirmation Order. The Defen-

dants filed a "factum" in opposition. On January 31, 2001, the Canadian Court denied Heatway's motion and ordered Heatway to engage in extensive discovery. The Canadian Court also sanctioned Heatway in the amount of $1000.

American States did not appeal that decision. Instead, it filed its motions in this Court in response to the Canadian Court's actions. American States claims that the Defendants are trying to force Heatway and the Carriers to respond to burdensome discovery, and that they are in violation of this Court's permanent channeling injunction. This Court scheduled a hearing on May 15, 2001.

The Defendants entered a limited appearance in this Court in order to refute American States' motion for contempt. The Defendants offer, in essence, four affirmative defenses to American States' motion. They claim that this Court does not have personal jurisdiction over them or the Canadian Litigation because they did not consent to this Court's jurisdiction by filing a proof of claim, objecting to the Plan, or participating in any way in Heatway's bankruptcy case. The Defendants next claim that the principals of comity do not apply here because they will be unduly prejudiced in the Canadian Litigation if they cannot discover evidence to prove that the problems with the CIBC building arose from a defective product, not negligent specification of an inappropriate product. The Defendants raise as a third defense that they are Canadian business enterprises, that the Canadian Court, which does have jurisdiction over them and the Canadian Litigation, has ruled in their favor, and that the ruling was based upon well-established precedent under Ontario Law. Finally, the Defendants argue

---

**2.** Doc. # 184, Order of Confirmation of Revised Amended Plan of Reorganization, Ex. A.

**3.** *Id.* at pg. 12.

that they seek only discovery from Heatway, along with a determination of the appropriate allocation of fault, and the right to collect from the Carriers amounts owed in excess of the funds already paid into the Insurance Fund by the Carriers. They claim that Heatway, not the Carriers, filed for bankruptcy relief, therefore, the Carriers are not protected by the Bankruptcy Court or the Plan. The Defendants also admit that had they realized Product Liability Claimants who objected to the Plan would have an opportunity to opt out of the Plan, they would have objected to the Plan. They, therefore, stated that they would consent to this Court's jurisdiction if they could be added to Exhibit A.

I find that the jurisdictional argument is dispositive of this matter, therefore, I will first deal with it.

## DISCUSSION

■■■ The filing of a bankruptcy petition creates an estate that contains all property in which a debtor has a legal or equitable interest:

> (a) The commencement of a case under section 301 ... creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

>> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal and equitable interests of the debtor in property as of the commencement of the case.[4]

The Bankruptcy Code's (the Code) expansive definition of property of the estate includes insurance policies that name the debtor as the insured.[5] Various Courts have found that including insurance policies as property of a Chapter 11 debtor's bankruptcy estate facilitates two primary goals of the reorganization process: (1) to insure the equitable division of a limited insurance fund; and (2) to facilitate the debtor's swift and efficient reorganization.[6] The Eighth Circuit reasoned that the policies are property of the estate if the insurance policies that cover some damage claims against the estate increase the distribution to other creditors not covered by the insurance policies.[7] That definition is most appropriate in this case. The Product Liability Claimants are limited to the distribution contained in the Insurance Fund. Heatway's remaining unencumbered assets will be distributed to other general unsecured creditors. In addition, the sum of $2.9 million that funds the Insurance Fund is a negotiated settlement between Heatway and the Carriers. Special Article Q is a recitation of that settlement. A substantial majority of Product Liability Claimants that participated in the Plan confirmation process voted in favor of Special Article Q. As a result, this Court confirmed the Plan, which limits recovery from the Carriers to a total sum of $2.9 million and releases all other claims. The Order confirming the Plan contains Special Article Q, which provides as follows:

> (a) American States Insurance Company, Transportation Insurance Company

**4.** 11 U.S.C. § 541(a)(1). *See also, Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 654 (D.Md.1998).

**5.** *Nat'l Union Fire Ins. Co. of Pittsburgh v. Titan Energy, Inc. (In re Titan Energy, Inc.)*, 837 F.2d 325, 329 (8th Cir.1988).

**6.** *Titan*, 837 F.2d at 330 (citing *Tringali v. Hathaway Mach. Co.*, 796 F.2d 553 (1st Cir.

1986); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.1986), *Cert. Denied Piccinin v. A.H. Robins Co., Inc.*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Davis*, 730 F.2d 176 (5th Cir.1984); *In re Johns–Manville Corp.*, 40 B.R. 219 (S.D.N.Y.1984)).

**7.** *Titan Energy*, 837 F.2d at 329.

and Valley Forge Insurance Company (CNA), and Lexington Insurance Company ("the Carriers") shall collectively pay the sum of $2.9 million to the Plan Trustee to be held in a segregated fund ("Insurance Fund") for the payment of Allowed Claims in Class 5A, if any. The Carriers shall make said payment within sixty days of the entry of the Confirmation Order.

(b) Subject to the pertinent terms and conditions of the Plan, the Plan Trustee shall make a distribution from the Insurance Fund to Allowed Claims in Class 5A, if any.

**(c) Permanent Injunction Against Prosecution of Released Claims**

In consideration of the establishment of the Insurance Fund and approval of Special Article Q, this Confirmation Order shall (a) constitute a permanent injunction and release by and against all past, present or future Product Claimants, whether known or unknown, including but not limited to any person, entity or party asserting rights of indemnity, contribution, reimbursement or other third-party claims, cross or counter-claims and any agents, assigns or attorneys claiming by, through or on their behalf (collectively referred to hereinafter as the *"Enjoined Parties"*), from initiating, continuing or prosecuting any actions or claims against the Debtor or the Carriers or any of their respective affiliates, assigns, employees, representatives, shareholders, officers, directors, predecessors, successors, officials, divisions, attorneys, merged or acquired companies or operations or any representative of each such party (collectively referred to hereafter as the *"Released Parties"*) or the property of the Released Parties, arising out of or in any way relating to or derivative of any Released Claim, (b) permanently enjoin the Enjoined Parties from the enforce-

ment, attachment, collection or recovery, by any manner or means of any judgment, award, decree, or order against the Released Parties or the property of the Released Parties, with respect to or arising out of or in any way relating to or derivative of any Released Claim, (c) permanently enjoin the Enjoined Parties from creation, perfection, or enforcement of any encumbrance of any kind against the Released Parties or the property of the Released Parties with respect to or arising out of or in any way relating to or derivative of any Released Claim, (d) permanently enjoin the Enjoined Parties from the assertion of any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Released Parties with respect to or arising out of or in any way relating to or derivative of any Released Claim, and (e) permanently enjoin the Enjoined Parties from any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Amended Plan or this Confirmation Order. *In the event any Product Claimant takes any action that is prohibited by, or is otherwise inconsistent with this Confirmation Order or the provisions of sections 6.9 of this Amended Plan, then this Court reserves jurisdiction to enforce the provisions of section 6.9 of the Amended Plan.*

The foregoing injunctive provisions are an integral part of Special Article Q and the Amended Plan and are essential to its implementation.

The provisions of Special Article Q and the injunction described in the Amended Plan and this Confirmation Order shall not apply to the personal claims of the Product Claimants listed on Exhibit A attached hereto.

(a) The channeling injunction provisions of Special Article Q is [sic] essential to an orderly liquidation of the claims against the Debtor. Such provisions will allow for equitable treatment of claimants holding Products Claims and serve the interests of justice and judicial economy by creating a single mechanism for the resolution of Product Claims

(b) The Debtor has given adequate notice calculated to inform all holders of potential Product Claims of (i) the Confirmation of the Debtor's Amended Plan, (ii) the establishment of the Insurance Fund and the provisions of Special Article Q, and (iii) each such holders right to object to the entry of the Confirmation Order confirming the Amended Plan and approving Special Article Q.

(c) As evidenced by the summary of ballots submitted to the Court at the confirmation hearing, a substantial majority of creditors, including those holding Products Claims, have voted to accept the Plan with the provisions of Special Article Q in place.

(d) *The contribution by the Carriers of $2.9 Million to the Insurance Fund is fair and adequate consideration for the entry of a permanent injunction against the holders of Released Claims.* Additionally, Special Article Q affords the most efficient mechanism for the greatest number of the holders of Products Claims to achieve the greatest possible recovery on such claims.

(e) The $2.9 Million Insurance Fund payment by the Carriers constitutes an indemnity payment of claims and not a payment of expenses under the Carriers' policies.

(f) The Carriers' support of Special Article Q and the $2.9 Million Insurance Fund payment do not constitute admissions of coverage, liability or any other matter and do act as waivers and shall not impair any other right of the Carriers.

(g) Based upon the approval of Special Article Q and the entry of the foregoing injunction, the Carriers shall release all claims they have against the Debtor and the Debtor shall release all claims against the Carriers.[8]

Special Article Q is, therefore, an extension of the automatic stay and the discharge injunction. The automatic stay, which goes into effect when a debtor files a bankruptcy petition,[9] stays any action by the Defendants to collect, assess, or recover a claim against Heatway:

(a) Except as provided by subsection (b) of this section, a petition filed under section 301 ... of this title ... operates as a stay, applicable to all entities, of—

. . . . .

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.[10]

The automatic stay serves to prevent " 'a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' "[11] A creditor's action in a foreign court poses a direct threat to the bankruptcy estate if it

---

8. Doc. #184, Order of Confirmation of Revised Amended Plan of Liquidation, pg. 11–13 (emphasis added).

9. *Underwood v. Hilliard (In re Rimsat, Ltd.),* 98 F.3d 956, 961 (7th Cir.1996) (citing *In re Holtkamp,* 669 F.2d 505, 508 (7th Cir.1982)).

10. 11 U.S.C. § 362(a)(6).

11. *Rimsat,* 98 F.3d at 961.

threatens to deplete the estate.[12] The Defendants claim that their actions in the Canadian Litigation have no bearing on the bankruptcy estate because they only seek to proceed against the Carriers. I disagree. The Carriers' decision to fund the Insurance Fund resulted from a negotiated settlement among Heatway, the Carriers, and any other party in interest that elected to participate in the confirmation process. The Carriers agreed to contribute $2.9 million to the Insurance Fund only in exchange for a release of all other claims, save the claims of Exhibit A Claimants. The Carriers made an informed decision based on the information made available to them by the participants. They agreed to be bound by the Plan, and voted in favor of the plan because Special Article Q limits the Carriers' exposure to $2.9 million plus any coverage that extends to Exhibit A Claimants. The very specific language of Special Article Q states that the release extends to all Product Liability Claimants. A finding that the release does not extend to the Defendants, in effect, is a recission of the confirmed Plan. And a recission of a confirmed Plan imperils the orderly administration of the bankruptcy proceedings.[13]

▮ The automatic stay affects proceedings in a foreign country.[14] The smooth, effective, and efficient administration of any bankruptcy case depends upon the Court's ability to marshal and control the assets of a debtor.[15] In this case, the insurance policies are an asset of Heatway, and the Plan is the most efficient mechanism for administering that asset.

▮ Section 105 of the Code grants to bankruptcy courts the authority to issue injunctions against third parties:

> (a) The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.[16]

As a result, creditors subject to a section 105 injunction are "expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order."[17]

The Defendants argue that they will be unduly prejudiced in the Canadian Litigation if they cannot obtain discovery to prove that the product was faulty. The Defendants, however, are not without legal recourse. Rule 2004 of the Federal Rules of Bankruptcy Procedure allow this Court to order the examination of any entity, including debtors, as to the acts, conduct, property, liabilities, or financial condition of the debtor.[18] In addition, the Defendants could seek to have the automatic stay lifted to allow them to remove the Canadian Litigation to this Court for trial.[19] Ultimately, however, if the Defendants wish to recover against Heatway,

**12.** *Id.*

**13.** *Id.*

**14.** *Rimsat,* 98 F.3d at 961.

**15.** *Rimsat,* 98 F.3d at 961.

**16.** 11 U.S.C. § 105(a)

**17.** *Celotex Corporation v. Edwards,* 514 U.S. 300, 306, 115 S.Ct. 1493, 1498, 131 L.Ed.2d 403 (1995).

**18.** Fed.R.Bankr.P.2004(b).

**19.** 28 U.S.C. § 1452(a); Fed.R.Bankr.P. 9027(2).

they must use the claims process in this Court, so that a determination can be made as to whether Heatway, or anyone else, is liable for the damages claimed by CIBC.

■ All pre-petition debts are discharged when a plan is confirmed, whether the creditor filed a proof of claim, whether the creditor accepted the plan, or whether the plan listed the debt.[20] All of debtors' obligations are thereafter governed by the confirmed plan.[21] And this Court has *in rem* jurisdiction over all property contained in the bankruptcy estate and subject to administration through a confirmed plan.[22] Moreover, this Court clearly has jurisdiction over Heatway and the Carriers. After extensive negotiations, this Court confirmed the Plan at a duly noticed confirmation hearing.[23] In order to confirm the Plan, this Court was mandated by the Code to find that the Plan was proposed in good faith, that the Plan is fair and equitable, and that the holders of unsecured claims will receive the maximum recovery possible.[24]

The Defendants received notice of all of the proceedings in this Court. They chose not to protect any rights they might have by participating in those proceedings. Nonetheless, this Court is mandated to protect the rights of all creditors in a Chapter 11 case. This Court confirmed the Plan only after all parties-in-interest who did participate convinced the Court, by their overwhelming acceptance of the Plan, that the establishment of the Insurance Fund provided for the maximum recovery for the Product Liability Claimants. To allow the Defendants to proceed against the Carriers in a foreign proceeding in defiance of the release issued by this Court would destroy the finality all other parties are entitled to expect from the Plan confirmation process.

The United States Supreme Court has held that there is a presumption against the extraterritorial application of the automatic stay.[25] Other courts, however, have found that the presumption is rebuttable.[26] Some courts, therefore, hold that the automatic stay cannot be effective against a creditor who begins a proceeding in a foreign tribunal unless the bankruptcy court has personal jurisdiction over the creditor.[27] Relying on 11 U.S.C. § 541(a), in conjunction with 28 U.S.C. § 1334(d), and the jurisdictional grant of 28 U.S.C. § 157(a), these courts hold that the bankruptcy court has exclusive jurisdiction over all property of the debtor, wherever located. By extension of the plain language of those sections, these courts also hold that Congress intended the stay to apply to property outside the territorial limits of

20. *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 642 (D.Md.1998).

21. *Id.*

22. 11 U.S.C. § 541; 28 U.S.C. § 1334(e); *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 654 (D.Md.1998).

23. *See* 11 U.S.C. § 1128.

24. 11 U.S.C. § 1129.

25. *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr.S.D.N.Y.1996) (citing *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)).

26. *See e.g. Lykes Bros. Steamship Co., Inc. v. Hanseatic Marine Serv. (In re Lykes Bros. Steamship Co., Inc.)*, 207 B.R. 282, 287 (Bankr.M.D.Fla.1997); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr.S.D.N.Y. 1996).

27. *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 653 (D.Md.1998); *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 516 (2nd Cir.1975).

the United States.[28] Thus, one court found that allowing a foreign creditor to seize property of the bankruptcy estate located outside the territorial confines of the United States would affect the "very" ability of the court to govern liquidation of the estate, and to effectively and fairly distribute the assets.[29]

In order for this Court to exercise personal jurisdiction over the Defendants, I must find that they had minimum contacts with the United States.[30] The following three actions by a party may satisfy the minimum contacts requirement: (1) transacting business in the United States; (2) doing an act in the United States; or (3) having an effect in the United States by an act done elsewhere.[31] The Defendants argue that they are Canadian entities separate and apart from their affiliates that transact business in the United States, that this entire transaction took place in Canada, and that they have done no acts in the United States. I agree. But I need only find that the Defendants performed an act in Canada that has an effect on Heatway in the United States in order to find that the Defendants are personally subject to the jurisdiction of this Court. I so find. As the Court stated in *In re McLean Industries, Inc.,*[32] by issuing process that violates a bankruptcy court order, "a creditor is affecting the very ability of the bankruptcy court to govern such a liquidation and to fairly distribute same and is tampering with the exclusive jurisdiction over all such property afforded

by 28 U.S.C. § 1334[e]."[33] As discussed above, the Defendants' actions against Heatway and the Carriers in the Canadian Litigation, without regard to this Court's Order of Confirmation containing a release of all claims against the Carriers, threatens to torpedo a confirmed Chapter 11 Plan. Heatway's Plan is a liquidating plan. Shortly after confirmation on August 18, 2000, Heatway sold certain of its assets to Watt's Industries, Inc. and Watt's Heatway, Inc. Watt's purchased those assets free and clear of all Product Liability Claimants. The proceeds of that purchase have been paid to Heatway's creditors, other than the Product Liability Claimants.[34] The Carriers deposited $2.9 million into the Insurance Fund to satisfy the claims of the Product Liability Claimants. The Defendants' actions against Heatway and the Carriers threaten to unravel those provisions of the confirmed Plan, even though many of the funds have already been distributed. Watt's is now operating as a new and separate entity from Heatway. I find that the channeling injunction is a material part of this Chapter 11 confirmed Plan. Any action that could be construed to be a breach of a provision that is a material part of the Plan would be a material default. As such, the Defendants' actions in Canada not only satisfy the minimum contacts requirement, but have a profound effect in the United States where the estate *res* is located. I find, therefore, that this Court has personal jurisdiction over the Defendants, and that their actions

28. *Lykes Bros.,* 207 B.R. at 287; *Nakash,* 190 B.R. at 768.

29. *Lykes Bros.,* 207 B.R. at 287.

30. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

31. *Lykes Bros. Steamship Co., Inc. v. Hanseatic Marine Serv. (In re Lykes Bros. Steamship Co.),* 207 B.R. 282, 286 (Bankr.M.D.Fla.1997).

32. 68 B.R. 690 (Bankr.S.D.N.Y.1986).

33. *Id.* at 694–95.

34. Doc. # 126.

are in violation of the automatic stay and the channeling injunction.

As to the Defendants comity argument, I am sensitive to the Defendants' dilemma. They claim that in order to prevail in the Canadian Litigation they need to prove that the product, not the design, was at fault. To so prove, they need to conduct discovery, and only Heatway has certain of the documents they need. The Defendants, however, could have promoted comity by asking this Court to allow them to conduct that limited discovery.[35] Had they done so, they would have been in compliance with the laws of this country, and could have avoided creating a conflict between the Canadian Court and this Bankruptcy Court.[36] As to the Defendants' desire to proceed against the Carriers, as explained above, the Insurance Fund is the result of a negotiated settlement between Heatway and the Carriers. The payment of $2.9 million into the Fund in exchange for a release of all Product Liability Claimants, save the Exhibit A Claimants, is, in essence, all that remains of the insurance policies.

In summary, I find that this Court has personal jurisdiction over the Defendants, that the Defendants are in violation of the channeling injunction, and that this Court has the authority to issue any Order necessary to enforce a provision of a duly confirmed Plan of Reorganization. I, therefore, will issue an Order holding that the Defendants are subject to the channeling injunction and the release of the Carriers from the claims of Product Liability Claimants. The Defendants may be allowed to utilize procedures authorized by the Code and the Federal Rules of Bankruptcy Procedure to conduct discovery in the Canadian Litigation, but ultimately the Defendants will only recover on any claim they

may have against Heatway if they timely file a proof of claim in this Court. Since CIBC has a claim against the Insurance Fund, this Court will be in a position to apportion damages among Heatway, Zeidler Roberts, The ECE Group, and Shore Tilbe Irwin & Partners if such claims are filed.

 As to the motion for contempt, I will deny that motion without prejudice. I will not hold the Defendants in contempt at this time for mistakenly proceeding with the Canadian Litigation without first obtaining relief from the injunction in this Court. The Canadian Court denied the Carriers' motion, the Carriers did not appeal that decision, and this Court has no authority to sit as an appellate court over a Canadian Court decision.

An Order in accordance with this Memorandum Opinion will be entered this date.

---

**35.** Fed.R.Bankr.P.2004(b).

**36.** *Nakash,* 190 B.R. at 770.