In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 21-2946 & 21-2954

IN RE:

JOSEPH C. SHEEHAN,

*Debtor.*

_____

JOSEPH C. SHEEHAN,

*Plaintiff-Appellant,*

*v.*

BRECCIA UNLIMITED COMPANY, *et al.*,

*Defendants-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:20-cv-05282 & 1:20-cv-05283 — **Andrea R. Wood**, *Judge.*

_____

ARGUED MAY 25, 2022 — DECIDED SEPTEMBER 7, 2022

_____

Before RIPPLE, ROVNER, and KIRSCH, *Circuit Judges.*

ROVNER, *Circuit Judge.* Joseph Sheehan, an Illinois resident,
would like the bankruptcy court in Illinois to enforce that

court's stay against his Irish creditors. Those creditors, who are residents of Ireland, seek to sell Sheehan's Irish property to recoup their loss on loans made in Ireland, and on which Sheehan defaulted in Ireland. The bankruptcy court determined it had no personal jurisdiction over the foreign defendants and granted their motions to dismiss. The district court on appeal affirmed the orders of the bankruptcy court, and we affirm that court's judgment.

**I.**

Joseph Sheehan is a retired surgeon who emigrated from Ireland several decades ago and currently lives in Winfield, Illinois. In 2006, Sheehan obtained loans from an Irish bank to buy interest in Blackrock Hospital Limited, an Irish medical company (the "Blackrock Shares"), and also to purchase personal real estate located in Ballyheigue, Ireland (the "Ballyheigue property"). In 2008, he obtained additional loans to pay for more Blackrock Shares. Both loans were secured by the Blackrock Shares themselves. Sheehan defaulted on both loans in 2010. In 2014, defendant-appellee Breccia Unlimited Company ("Breccia"), an Irish entity that also owned shares in Blackrock Hospital Limited, acquired the loans—both the loans secured by the Blackrock Shares and the Irish bank's interest in the Ballyheigue property mortgage—and proceeded to take steps to foreclose on the underlying collateral. Breccia is a private unlimited company incorporated under the laws of Ireland and maintains its principal place of business in Dublin. Sheehan sued to prevent those foreclosure efforts in Irish courts, but in July 2019, an Irish appellate court found in Breccia's favor and gave the company authorization to enforce its security interest in the Blackrock Shares and the Ballyheigue property

with the aid of an Irish receiver. The Irish Supreme Court declined to disturb that final judgment. Subsequently, in December 2019, Breccia registered the Blackrock Shares in its name and appointed a receiver, defendant-appellee Damien Murran, to take possession of the Ballyheigue property, secure it, market it, and sell it. Murran is an Irish citizen who resides in Ireland and is an employee of defendant-appellee, RSM Ireland Business Advisory Limited ("RSM Ireland"). RSM Ireland is an Ireland limited liability company.[1] On March 5, 2020, Breccia appointed Murran as the receiver for the Ballyheigue Property as well. Murran accepted the receivership on March 23, 2020.

On March 12, 2020, Sheehan filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois. Under the rules of the United States Bankruptcy Code, Sheehan's bankruptcy filing triggered an automatic stay applicable to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C.

---

[1] Sheehan alleges that RSM Ireland holds itself out as having a presence and capabilities within the United States, and specifically in Chicago, as part of a global RSM network. RSM Ireland, on the other hand, describes itself as an Irish limited liability company which is part of a network of other companies trading as RSM. According to RSM Ireland, and as noted on the website, "Each member of the RSM network is an independent accounting and advisory firm each of which practices in its own right. The RSM network is not itself a separate legal entity of any description in any jurisdiction." https://www.rsm.global/ireland/offices. RSM Ireland does not conduct and is not related to any business in the United States. Sheehan has not provided any factual or legal authority for the bare assertion that an independent company affiliated with a network of other independent companies can be considered to be doing business in any jurisdiction in which any company in the network operates.

§ 362 (a)(3). On the same day that Sheehan filed his bankruptcy petition, he notified the Irish receiver, Murran, that he had commenced bankruptcy proceedings, and that the automatic stay barred any efforts by the receiver to exercise control over the Blackrock Shares. Several days later, on March 18, he provided the same notice to Breccia, but this time noted that the stay applied not only to the Blackrock Shares, but also to "any other property owned by Dr. Sheehan." App. 80.[2] Nevertheless, Breccia, having prevailed in the Irish courts, continued, through the receiver, to take the necessary steps toward sale of the collateral securing the loans on which Sheehan had defaulted. For example, on March 13, 2020, Murran entered into a contract with defendant-appellee, Irish Agricultural Development Company Unlimited ("IADC") for the sale of the Blackrock Shares.[3] Like the other two companies, IADC is incorporated in Ireland, maintains its principal

---

[2] References to "App." refer to the Appendix of Plaintiff-Appellant Joseph C. Sheehan, volumes I and II, located at R. 19-1 & 19-2 in the appellate docket.

[3] Breccia maintains that the sale occurred before Breccia's Irish counsel received any notification regarding Sheehan's bankruptcy, which according to Breccia occurred when Sheehan's counsel contacted Breccia's counsel on March 18, 2020. *See* App. 79–81. Nevertheless, Sheehan's counsel sent notice of the bankruptcy filing to Murran's counsel on March 12, 2020 via e-mail, (*See* App. 56–58). We can assume, therefore, that Murran's counsel had notice of the bankruptcy filing when Murran entered into the contract with IADC, even if Breccia did not. In any event, the timing of the transaction does not have any bearing on the outcome of this proceeding.

We also note that, as of February 24, 2020, the Irish courts were still issuing post-decision rulings, including an injunction to prevent Sheehan from disposing of his assets in Ireland, which may have affected the timing of the receiver's sales.

place of business in Ireland, and has no operations in the United States.

On March 25, 2020, Murran accepted an appointment as receiver for the Ballyheigue property, but Sheehan did not become aware of the Ballyheigue property receivership until April 7, 2020, when the receiver informed Sheehan that the receivership of the property had commenced, the locks had been changed, and the receivership intended to sell the property and apply the proceeds toward the discharge of Sheehan's debts. Six days later, on April 13, 2020, Sheehan filed the underlying adversary complaint in the United States bankruptcy court, alleging that Breccia, IADC, the receiver Murran, and Murran's employer, RSM Ireland, improperly exercised control over the property of his bankruptcy estate in violation of the Bankruptcy Code's automatic stay provision. In his complaint, he requested the return of the Blackrock Shares and the Ballyheigue Property to the bankruptcy estate, an order compelling the defendant-appellees to comply with the automatic stay, and an award of damages for their willful violation of the automatic stay.

Sheehan initially e-mailed the defendants to request that they accept service of process of the complaint through their Irish attorneys. The defendants did not do so, but rather argued *inter alia* in support of their subsequent motions to dismiss that the email notice Sheehan had provided was not sufficient process under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Service Convention"). On June 12, two months after Sheehan filed his adversary complaint, and one month after the defendants filed their motions

to dismiss, Sheehan formally served Murran, RSM, and IADC. He formally served Breccia on June 16.

On May 13, thirty days after Sheehan filed his complaint, Breccia and IADC together moved to dismiss the adversary proceeding, and Murran and RSM Ireland jointly did the same. Both motions sought dismissal of the adversary complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, and 12(b)(5) for insufficient service of process.[4] In addition, Murran and RSM Ireland argued that the doctrine of *forum non conveniens* dictated dismissal. In response, and as an alternative to denial of the motions to dismiss, Sheehan requested discovery related to the matters set forth in the declarations attached to the defendants' motions to dismiss. The bankruptcy court granted both motions to dismiss (in separate orders), finding that the bankruptcy court lacked personal jurisdiction over the Irish defendants, as none of the defendants conducted any activity related to the adversary claims in the United States, and the only link between the defendants and the forum was the fact that Sheehan lived in Illinois. The bankruptcy court also concluded that Sheehan's e-mail service to the defendant-appellees was ineffective under the Hague Service Convention. In its order granting Murran and RSM Ireland's motion to dismiss, the bankruptcy court also held that the doctrine of *forum non conveniens* provided an additional basis for dismissal. Sheehan appealed to the district court which confirmed that the bankruptcy court lacked personal jurisdiction over any defendant. Additionally, the district court concluded that "all of the facts that [Sheehan] wished to investigate through jurisdictional

---

[4] The Federal Rules of Civil Procedure apply in an adversary proceeding in bankruptcy court. *See* Fed. R. Bankr. P. 7012(b).

discovery either do not involve [the defendants'] suit-related conduct or concern their contacts with Sheehan regarding the Blackrock Shares or the Ballyheigue Property," and thus the bankruptcy court had not abused its discretion in denying discovery *sub silentio*. App. 637, 651. Having found that the bankruptcy court lacked personal jurisdiction over the defendants, the district court did not reach the questions of service of process or *forum non conveniens*.

## II.

We review the judgment of the district court using the same standard of review with which the district court reviewed the bankruptcy court's ruling. *Wiese v. Cmty. Bank of Cent. Wis.*, 552 F.3d 584, 588 (7th Cir. 2009). Specifically, we review a district court's dismissal for lack of subject matter jurisdiction de novo, while reviewing findings of fact considered in determining jurisdiction only for clear error. *City of Chicago ex rel. Rosenberg v. Redflex Traffic Sys., Inc.*, 884 F.3d 798, 802 (7th Cir. 2018); *see also Illinois Ins. Guar. Fund v. Becerra*, 33 F.4th 916, 922 (7th Cir. 2022) ("Subject-matter jurisdiction sometimes depends on disputed factual issues, and we review for clear error a district court's findings on jurisdictional facts.").

### A. Personal jurisdiction

An assessment of jurisdiction is the starting point of every case in federal court. In this case, it happens to be the ending point as well. The bankruptcy court is a court of limited jurisdiction and receives its jurisdictional mandate in a statutory grant of power. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995) (listing the statutory sources of a bankruptcy court's jurisdiction). And of course, as the Federal Rules of Bankruptcy

Procedure remind us, all jurisdiction is ultimately subject to constitutional constraints. Fed. R. Bankr. P. 7004(f) ("If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule … is effective to establish personal jurisdiction over the person of any defendant … ."). Specifically, due process requires that out-of-forum defendants must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash. Off. of Unemp't Comp. & Placement*, 326 U.S. 310, 316 (1945).[5]

When a defendant moves to dismiss a complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that jurisdiction exists. *Purdue Res. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). At this stage of the proceedings, however, Sheehan was only required to make a prima facie showing that the defendants had the necessary minimum contacts. *Durukan Am., L.L.C. v. Rain Trading, Inc.*, 787 F.3d 1161, 1163–64 (7th Cir. 2015); *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). As with a Rule 12(b)(6) motion, the

---

[5] Because Congress has authorized broad, nationwide service of process through Federal Rule of Bankruptcy Procedure 7004(d), personal jurisdiction disputes in bankruptcy proceedings generally implicate the Due Process Clause of the Fifth Amendment. *See Diamond Mortg. Corp. of Illinois v. Sugar,* 913 F.2d 1233, 1244 (7th Cir. 1990). By contrast, questions of personal jurisdiction in other contexts generally implicate the Due Process Clause of the Fourteenth Amendment, as Congress has directed that federal courts ordinarily follow state law in determining personal jurisdiction requirements. *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)).

Court must "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff" when evaluating personal jurisdiction. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007).

Because Sheehan attempts to link personal jurisdiction over the defendants to the bankruptcy court's *in rem* jurisdiction, we will begin with a brief look at a bankruptcy court's jurisdiction over property. A bankruptcy court has *in rem* jurisdiction over all of the property in a debtor's estate, which includes all property "wherever located and by whomever held." 11 U.S.C. § 541(a); 28 U.S.C. § 1334(e)(1); *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004). The filing of a bankruptcy petition triggers an automatic stay prohibiting any attempts to exercise control over any property of the estate. 11 U.S.C. § 362(a)(3). Prohibitions on such attempts, however, cannot be enforced if a court does not have personal jurisdiction over the party holding the property. *Hood*, 541 U.S. at 448 ("Because the court's jurisdiction is premised on the res, however, a nonparticipating creditor cannot be subjected to personal liability."); *Freeman v. Alderson*, 119 U.S. 185, 188 (1886) ("The state has jurisdiction over property within its limits owned by non-residents, and may therefore subject it to the payment of demands against them of its own citizens. … If the non-resident possesses no property in the state, there is nothing upon which its tribunals can act.").

Sheehan spends many pages of his brief focusing on the *in rem* jurisdictional powers of the bankruptcy court. There is no need to convince this court that the bankruptcy court had jurisdiction over any property in Sheehan's estate, however, as this point was conceded by all parties and recognized by both

courts below. In pursuit of his *in rem*-focused argument,
Sheehan asserts conclusively that "[t]he Blackrock Shares and
the Ballyheigue Property are property of the Debtor's bank-
ruptcy estate." Sheehan Brief at 16. The accuracy of this state-
ment is far from clear given the Irish court's judgment against
Sheehan in a suit in Ireland.[6] For purposes of these proceed-
ings, however, the defendants are willing to concede that
Sheehan held some kind of interest in the Blackrock Shares
and Ballyheigue property at the time he filed his bankruptcy
petition, and we will do the same. But the court's ability to
assert control over any property in Sheehan's estate located in
Ireland depends on whether the court has personal jurisdic-
tion over the Irish citizens and entities holding that property.

Sheehan's *in rem*-linked theory relies on the legal fiction
that property of a bankruptcy estate "regardless of actual

---

[6] Sheehan asserts that as of the date that he petitioned for bankruptcy,
March 12, 2020, he still owned the Blackrock Shares (or as he states, "a 28%
equity interest in Blackrock Hospital Limited") and that Breccia had only
asserted a security interest in those shares. Sheehan Brief at 3. The defend-
ants explain that on July 31, 2019, the Court of Appeal of Ireland entered
judgment in favor of Breccia and against Sheehan and lifted the injunction
that had previously prevented Breccia from realizing on its collateral. In
2019, Breccia registered the Blackrock Shares in its own name and ap-
pointed a receiver to sell them. The original Irish lending bank acquired
legal title to the Ballyheigue property in 2006 when it extended the mort-
gage to Sheehan, and Breccia acquired that title when it purchased the
mortgage in 2014. Although questions certainly remain about what inter-
est Sheehan retained in these assets, we need not resolve this matter be-
cause even if Sheehan retained any interest in the Blackrock Shares and
Ballyheigue property, and the bankruptcy court had jurisdiction over the
disputed assets by means of its power of *in rem* jurisdiction over the prop-
erty of Sheehan's estate, it did not have personal jurisdiction over any of
the defendants holding that property.

location—is *legally* located within the jurisdictional boundaries of the district in which the court sits." Sheehan Brief at 22 (quoting *In re Simon*, 153 F.3d 991, 996 (9th Cir. 1998) (emphasis in original)). According to Sheehan's argument, because the Irish property was subject to the legal fiction of being in Illinois, all of the defendants' actions to seize and sell that property must also have occurred (fictionally) in Illinois. And because all of the defendant's actions occurred (fictionally) in Illinois, the defendants must have minimum contacts with Illinois. Sheehan has not asserted any authority for this theory linking personal jurisdiction to *in rem* jurisdiction, and it is no wonder that he has not. If a court could connect any person to estate property in this way there would be no need for an assessment of specific personal jurisdiction in bankruptcy cases. All actions would occur where the *res* was fictionally located, which, by definition, is wherever the bankruptcy court sits. Sheehan cannot bootstrap the personal jurisdiction claim in this circular manner, and we must look further to see whether the court had personal jurisdiction over the defendants.

A court can have either general or specific personal jurisdiction over a party. Neither party asserts that the court has general jurisdiction over the defendant-appellees, as none are "at home" in the jurisdiction either by being incorporated in Illinois or having a principal place of business there. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 924 (2011). All defendant-appellees are Irish citizens or Irish businesses and conduct their business operations in Ireland.

Thus we turn to the only applicable question of jurisdiction—whether the bankruptcy court had specific personal jurisdiction over the defendants. Specific personal jurisdiction depends on "an affiliation between the forum and the

underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1780 (2017) (cleaned up).

This court has enumerated the requirements for specific personal jurisdiction as follows: first, defendants must have purposefully directed their activities at the forum state or purposefully availed themselves of the privilege of conducting business in the forum; second, the alleged injury must arise out of or relate to the defendants' forum-related activities; and third, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *Rogers v. City of Hobart, Ind.*, 996 F.3d 812, 819 (7th Cir. 2021); *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010).

Within the framework of those three requirements, the Supreme Court and this court have given more specific guidance on what it means to have purposefully directed activity at a forum or availed oneself of the privileges of a forum. That guidance informs us that our assessment of personal jurisdiction must focus on the acts and activities of the defendant. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *NBA Properties, Inc. v. HANWJH*, No. 21-2909, 2022 WL 3367823, at *4 (7th Cir. Aug. 16, 2022). The relationship between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. at 284 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in both opinions); *see also Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 109 (1987) ("Jurisdiction is proper ... where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State.") (emphasis in original)

(internal citations omitted); *Rogers*, 996 F.3d at 820 ("[A] defendant's relationship to the forum state must arise out of contacts that the defendant *himself* creates with the forum State.") (internal citations omitted) (emphasis in original).

This means that specific personal jurisdiction cannot depend solely on the actions of the plaintiff or third parties. *Walden*, 571 U.S. at 284. Moreover, the defendants' minimum contacts must be with the forum itself and not merely with a person who resides there. *Id.* at 285. Said another way, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* at 285. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 286 (quoting *Burger King*, 471 U.S. at 475); *see also NBA Properties*, 2022 WL 3367823, at *7 ("The question is not whether the plaintiff purchased enough goods to subject the defendant to personal jurisdiction. The focus is whether [the defendant] purposefully directed its conduct at Illinois.").

This focus on a defendant's activities means that it is not enough that the defendant took some action that ultimately had an effect on the plaintiff in the forum. "The question is not whether the plaintiff experienced a particular injury or effect in the forum state but whether the defendant's conduct connects him with the forum in a meaningful way." *Rogers*, 996 F.3d at 819. A "meaningful way" is one in which defendants "purposefully directed" their actions at the forum. *Id.* This is true even if the defendant could have foreseen the

effect on the plaintiff—that is, that the plaintiff would be harmed in the forum. *Burger King Corp.*, 471 U.S. at 474; *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). The Supreme Court's precedents make clear "that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 883 (2011). Thus, for example, "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Asahi Metal Indus.*, 480 U.S. at 112. Likewise liquidating property in Ireland after receiving permission from an Irish court to do so is not activity directed toward Illinois merely because it might have an effect on a resident and citizen of Illinois.

We can see the difference between actions that are purposefully directed at a forum and those that are not, by juxtaposing two Supreme Court cases addressing personal jurisdiction. In *Calder v. Jones*, 465 U.S. 783 (1984), a reporter and editor, both of whom were based in Florida, published an allegedly libelous magazine article that was widely circulated in California. The Court found that the California court had jurisdiction over the defendants not only because their actions had an effect in California—that is, damage to the plaintiff's reputation—but also because the defendants had created ample contacts with California—they reached into California by telephoning and relying on California sources, they wrote the story about the plaintiff's activities in California, and they published it in a magazine that was widely circulated in that state. *Id.* at 788–89. The Court noted that the defendants engaged in activities that were purposefully "calculated to cause

injury to [the] respondent in California." *Id.* at 791. In short, although the Court did comment on the effect the defendants' actions had on the plaintiff in California, its primary assessment was of the various contacts the defendants had with the forum state itself, "focus[ing] on the relationship among the defendant, the forum, and the litigation." *Calder*, 465 U.S. at 788 (internal citation omitted). As the Supreme Court later explained regarding its holding in *Calder*,

> Although we recognized that the defendants' activities "focused" on the plaintiff, our jurisdictional inquiry "focused on 'the relationship among the defendant, the forum, and the litigation.'" *Calder*, 465 U.S. at 788. Specifically, we examined the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story. We found those forum contacts to be ample.

*Walden*, 571 U.S. at 287 (cleaned up).

The *Walden* court went on to explain that mere injury to a forum resident, even if predictable, is not a sufficient connection to the forum. *Id.* at 290. "The crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Id.* at 287.

The *Walden* court distinguished the facts in *Calder* from those in the case before it and held that a Georgia police officer in a Georgia airport who questioned and searched Nevada travelers, seized their cash, and allegedly filed a false probable cause affidavit to support that seizure, could not be successfully haled into a Nevada court as a defendant even if

the officer must have known that his actions would cause harm to the Nevada plaintiffs in their home state. The Court compared the two cases and found that, unlike the reporter in *Calder*, the officer in *Walden* never travelled to Nevada, conducted activities therein, contacted anyone in Nevada, sent anything to anyone in Nevada, or otherwise aimed his activity at Nevada. *Walden*, 571 U.S. at 289.

Similarly, this court has concluded that when a plaintiff is injured by acts that a defendant commits entirely within one forum (in this case, Ireland), the fact that the plaintiff suffers the negative effects of those acts in his home forum (in this case, Illinois) does not confer personal jurisdiction over the defendant in the latter forum. *See Mobile Anesthesiologists Chicago, L.L.C. v. Anesthesia Assocs. of Houston Metroplex*, 623 F.3d 440, 444 (7th Cir. 2010). In *Mobile Anesthesiologists*, a medical anesthesia business in Houston created a website in Houston with a similar name to one registered to Mobile Anesthesiologists Chicago. The Houston defendant continued to use the website even after receiving a cease and desist letter from the plaintiff Chicago company, which the plaintiffs maintained constituted actual knowledge that the plaintiff was suffering a harm in Illinois. Nevertheless, we noted that the Supreme Court in *Calder* made clear "that a defendant's intentional tort creates the requisite minimum contacts with a state only when the defendant expressly aims its actions at the state with the knowledge that they would cause harm to the plaintiff there." *Id.* at 445. In other words, harm to a plaintiff in the forum state is by itself insufficient. *Id.* at 447. The *Mobile Anesthesiologists* opinion emphasized the requirement that the defendants "expressly aim[]" their conduct at the forum state. *Id.* at 445–46. Thus, this court concluded, although the Houston doctor created and maintained a website that was

certainly accessible in the forum state of Illinois, he did not aim his services or other actions there. The doctor was not licensed to practice in Illinois, his website had only a Houston-area phone number, and contained an invitation to doctors in the greater Houston area to contract with him for services. *Id.* at 446. We have summed up this case and the rest of our specific personal jurisdiction cases by noting that our focus is on the deliberate actions of the defendants and whether they target or direct themselves toward the forum state. *Advanced Tactical Ordnance Sys., L.L.C. v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014).

In short, "'express aiming' remains the crucial requirement when a plaintiff seeks to establish personal jurisdiction under *Calder.*" *Mobile Anesthesiologists Chicago*, 623 F.3d at 445–46. In this case, the defendants' acts in Ireland may indeed have had an effect upon Sheehan in Illinois, but none of the defendants "intentionally direct[ed]" or "expressly aim[ed]" the alleged wrongdoing (exerting control over and liquidating collateral) at Sheehan, let alone at Illinois. *Walden*, 571 U.S. at 289 ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections."); *Mobile Anesthesiologists Chicago,* 623 F.3d at 445 ("[A] defendant's intentional tort creates the requisite minimum contacts with a state only when the defendant expressly aims its actions at the state with the knowledge that they would cause harm to the plaintiff there."). The Irish defendants directed their activity at Irish property located in Ireland and which served as collateral for a loan made by an Irish bank, in accordance with the permission of an Irish court after several years of litigation resolving disputes over ownership of the property. None of the defendants did anything to reach

out to the United States and affiliate themselves with the United States or Illinois. The only connection between the defendant's suit-related conduct and the United States is Sheehan's residence in Illinois and his unilateral act of filing for Chapter 11 bankruptcy in Illinois. Specific personal jurisdiction cannot be based on the plaintiff's mere presence in the forum or on the "unilateral activity" of a plaintiff. *Walden*, 571 U.S. at 285–86. As an aside, it is worth noting that the genesis of this case came from Sheehan's acts when he reached out to Ireland to request financing from an Irish bank to purchase Irish property. The defendants were on the path to liquidating the collateral for that financing when Sheehan filed for bankruptcy in Illinois. Long before Sheehan filed for bankruptcy in Illinois, the defendants had litigated in Irish courts their right to liquidate the collateral, and they had already put into place a receivership to do just that. Had Sheehan never filed for bankruptcy in Illinois (or had he filed in any other state), the defendants would have proceeded just as they did. *See Walden*, 571 U.S. at 290. They cannot, therefore, have been aiming their conduct at Illinois.

Moreover, the fact that the defendants could have foreseen that their conduct would effect Sheehan in Illinois was insufficient to establish personal jurisdiction. *See Walden*, 571 U.S. at 289. Thus Sheehan's unilateral act of sending notice to the defendants of the bankruptcy proceedings in Illinois and the effect of the automatic stay, did not create minimum contacts. "To find express aiming based solely on the defendant's receipt of [a] letter [informing the defendants of the harm in the forum state] would make any defendant accused of an intentional tort subject to personal jurisdiction in the plaintiff's home state as soon as the defendant learns what that state is. *Calder* requires more." *Mobile Anesthesiologists*, 623 F.3d at 447.

Despite the clear guidance from *Walden*, *Calder*, and *Mobile Anesthesiologists*, Sheehan cites to three bankruptcy cases from out-of-circuit bankruptcy courts (all pre-dating *Walden*) which Sheehan interprets to require this court to find that the court in this case had personal jurisdiction over the defendants.[7] We need not spend much time differentiating these cases from the one before us or ruling on the propriety of the holdings, as our charge is to follow the dictates of the Supreme Court and this circuit which instruct that the defendants' contacts with the bankruptcy court here were insufficient to establish jurisdiction.

We also find that the alleged injury to Sheehan did not arise out of defendants' forum-related activities. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021). All of the acts taken by the defendants to assert control and ownership over the Irish property occurred in Ireland. *See, e.g.*, *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 915 (7th Cir. 2015) (even an informational business trip to Illinois did not turn a primarily Korean business deal into one with jurisdictional contacts in Illinois). Moreover, the few letters that Breccia sent to Sheehan announcing the receivership and start of the liquidation of Sheehan's collateral for defaulted loans were nothing more than ministerial actions taken in light of the Irish court's disposition of the litigation in Ireland. They

---

[7] *In re Probulk Inc.*, 407 B.R. 56 (Bankr. S.D.N.Y. 2009); *In re Chiles Power Supply Co.*, 264 B.R. 533 (Bankr. W.D. Mo. 2001); *In re Lykes Bros. S.S. Co.*, 207 B.R. 282 (Bankr. M.D. Fla. 1997).

do not constitute taking aim at Illinois, and were far from sufficient to create minimum contacts with Illinois.

Given our conclusion that none of the defendants had minimum contacts with the United States, we need not determine whether exercising personal jurisdiction would "violate traditional notions of fair play and substantial justice." *Int'l Shoe,* 326 U.S. at 316; *Rogers*, 996 F.3d at 819.

### B. Discovery

As an alternative to a denial of the motion to dismiss, Sheehan asked the bankruptcy court to allow discovery relating to the testimony in the declarations submitted in support of the defendants' motions to dismiss. The bankruptcy court granted the motions to dismiss based on its finding that it lacked personal jurisdiction over the defendants and based on Sheehan's failure of service under the Hague Service Convention. The bankruptcy court did not specifically address Sheehan's alternative request for discovery. Like district courts, bankruptcy courts have wide discretion on matters of discovery. *See, e.g., USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 514 (7th Cir. 2022). We therefore review for abuse of discretion only, and grant great deference to, a bankruptcy court's decision to disallow discovery. *Fields v. City of Chicago*, 981 F.3d 534, 551 (7th Cir. 2020). A plaintiff must be able to establish "a colorable or prima facie showing of personal jurisdiction before discovery should be permitted." *Cent. States*, 230 F.3d at 946. In addition to the heavy weight of a bankruptcy court's discretion, there is a further thumb on the scale weighing against discovery in this case: "[f]oreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists." *GCIU-Emp. Ret. Fund v. Goldfarb*

*Corp.*, 565 F.3d 1018, 1026 (7th Cir. 2009) (quoting *Cent. States*, 230 F.3d at 946).

The district court noted that the bankruptcy court had not abused its discretion as "all of the facts that [Sheehan] wishes to investigate through jurisdictional discovery either do not involve Appellees' suit-related conduct or concern their contacts with Sheehan regarding the Blackrock Shares or the Ballyheigue Property." App. 637, 651. We agree with the district court. Sheehan's requests appear to be unrelated to the adversary proceeding before the bankruptcy court in this case or are so bare and unsupported that to grant discovery would be to allow a fishing expedition. "[A] district court does not abuse its discretion in denying additional discovery where the request was based on nothing more than mere speculation and would amount to a fishing expedition." *Helping Hand Caregivers, Ltd. v. Darden Restaurants, Inc.*, 900 F.3d 884, 890 (7th Cir. 2018) (internal quotations omitted). Nor is a plaintiff entitled to discovery to establish essentially speculative allegations necessary to personal jurisdiction. *Viahart L.L.C. v. Partnerships & Unincorporated Ass'ns Identified on Schedule "A"*, No. 19 CV 8181, 2022 WL 1004412, at *3 (N.D. Ill. Apr. 4, 2022) ("[A] court should deny a plaintiff's request [for discovery] if it's based on only unsupported assertions of personal jurisdiction or appears frivolous."); *Rovanco Piping Sys., Inc. v. Perma-Pipe Int'l Holdings, Inc.*, No. 21 C 3522, 2022 WL 683690, at *4 (N.D. Ill. Mar. 8, 2022) ("A plaintiff may not rely on bare, attenuated, or unsupported assertions of jurisdiction to justify discovery.") (internal citations omitted). The bankruptcy judge considered the motion to dismiss and an extensive record with attached exhibits which included declarations from Sheehan, Murran, a representative of Breccia, and an Irish solicitor opining on the extraterritorial effect of a foreign

bankruptcy filing in Ireland; extensive correspondence between counsel for the parties; documents pertaining to the bankruptcy and receivership in Ireland; and a multitude of other exhibits. The bankruptcy court was in the best position to assess whether further discovery on the issues raised by Sheehan could reveal facts, which, if true, might alter its decision on the court's personal jurisdiction over the defendants. Given our review of the record below, and the bankruptcy court's holding on personal jurisdiction, we see no signs that the bankruptcy court abused its discretion in denying the requested discovery (or that the district court erred in sustaining the bankruptcy court's decision).

Because we hold that the bankruptcy court had no jurisdiction over the defendants, we need not address the issues of proper service or *forum non conveniens*.

The judgment of the district court is AFFIRMED.